**DALLAS ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW, Leon Gowans, and Scott Holladay, Plaintiffs,**

v.

**DALLAS COUNTY HOSPITAL DISTRICT, Defendant.**

**Civ. A. No. 3–79–0055–H.**

United States District Court,
N. D. Texas,
Dallas Division.

Nov. 8, 1979.

Roger E. Albright, Dallas Legal Services Foundation, Inc., Dallas, Tex., for plaintiffs.

Earl Luna and Thomas V. Murto, III, Dallas, Tex., for defendant.

OPINION

SANDERS, District Judge.

In this first amendment freedom of speech case plaintiffs challenge the constitutionality of defendant's no solicitation rule at Parkland Memorial Hospital in Dallas. The rule prevents plaintiffs from distributing leaflets at Parkland which are critical of the hospital.

Plaintiffs contend this no solicitation rule is an overly broad prior restraint of speech, and sue to have the rule declared unconstitutional and its enforcement enjoined.

Defendant asserts Parkland Hospital is not a public forum and the no solicitation rule is necessary to enable the hospital in carrying out its purpose and primary activity of rendering health care to patients.

The court holds Parkland Hospital is not a public forum for first amendment activity, and plaintiffs do not have a constitutional right to solicit or to distribute leaflets at Parkland.[1]

---

1. The Board of Managers of the Defendant holds its monthly meetings at Parkland. The meetings are open to the public and members of the public, including plaintiffs, currently ap-

## I.  The Parties

### A.  The Hospital

Parkland Memorial Hospital ("Parkland") in Dallas, Texas, is owned and operated by Defendant Dallas County Hospital District ("the District").[2]  Parkland has facilities for emergency care, inpatient hospital care, and outpatient care.

The Outpatient Clinic ("clinic") is the principal area of the hospital in which Plaintiffs want to distribute their leaflets. This clinic is a five story annex to the main part of the hospital.  The clinic provides medical care to indigent patients who are ambulatory, which usually means they are well enough to walk in, receive care, and walk out.  The clinic now treats many more patients than it was designed to handle;[3] it is always extremely crowded.  There is a large waiting room on each floor of the clinic with closed treatment rooms surrounding the waiting rooms.  Most of the patients served in the clinic are indigent in contrast to the inpatient hospital areas where there are a substantial number of paying patients.[4]  The clinic has two entrances, one from the main lobby and one from the outside.[5]

Plaintiffs seek to distribute leaflets in the clinic waiting areas, the first floor halls and lobby, the hospital streets and sidewalks, the hospital parking lots, the cafeteria, the gift shop, and the vending machine section. The heart of the first floor is the small main lobby with halls like arteries branching from the lobby.[6]  These halls on the first floor lead to the Outpatient Clinic;  to the Triage Clinic, which diagnoses patients and directs them to the appropriate areas of the hospital;  to the pharmacy, which has a large and crowded waiting room;  and to the administrative offices of the hospital.

Health care personnel sometime use the waiting rooms for activities related to patient care.  These activities include teaching patients, counselling families, taking patient histories, and administering medication and I.V.'s.  On rare occasions when the treatment rooms are full some medical treatment like drawing blood occurs in the clinic waiting rooms.  More commonly, the clinic waiting rooms because of their size are used for teaching patients.  For example, instruction to diabetic patients is given in the clinic waiting rooms weekly.  There are also classes in the clinic waiting rooms for obstetrics and cardiac patients.

The hospital complex is surrounded by busy public streets.  The vehicular access to the hospital is limited to three entrances. (A fourth entrance is to the emergency room.)  There is a patient parking lot on the grounds of the hospital, and a public parking lot across the street.  Those patients who do not arrive by cars or taxis generally come by bus.  There are three bus stops located on city property adjacent to the hospital.

### B.  ACORN

Plaintiffs are Dallas Association of Community Organizations for Reform Now

---

pear and speak.  Nothing in this Opinion is to be construed as affecting the open meeting policy of the Board.

2.  The District was created under art. 4494n, Tex.Rev.Civ.Stat. (Vernon 1976)  Approximately one-half of the District's operating revenues are from *ad valorem* taxes levied in Dallas County.  The Board of Managers, which is appointed by the Dallas County Commissioners Court, governs the hospital.  The Board appoints a general manager, known as the Administrator of the Hospital District.

3.  In 1978 the clinic averaged 906 patients a day in a facility designed for 400.  Since the clinic was built in 1958, the number of patients treated there has increased on an average of 10% per year.  A 1978 study projected future demand for the clinic and recommended a new ten story building to replace the current five story structure.

4.  Less than 10% of the outpatients are paying patients.  A little over half of the inpatients are paying patients.

5.  In 1977 the outside entrance to the clinic was so crowded the assistant administrator instructed the employees to quit using that entrance.

6.  The main lobby has a registration desk.  Frequently, ill patients who should go to the emergency room come to the registration desk.

("ACORN"); Scott Holladay, the past regional organizer for ACORN; and Leon Gowans, chairman of a neighborhood group affiliated with ACORN. ACORN is an organization of low to moderate income families which operates through neighborhood groups to promote social and economic changes. In the fall of 1978 one of the issues in which ACORN members were interested was the improvement of health care provided to low and moderate income residents of Dallas County. During this time ACORN members were attending meetings of the Board of Managers of the District and speaking to the press about their grievances. Plaintiffs make no complaint regarding their access to the Board meetings.

Parkland is the primary hospital in Dallas County providing medical care to the indigent. ACORN believes that the quality of the medical care rendered at Parkland Hospital is good. ACORN, however, desires to mobilize the patrons of Parkland to improve defective health care conditions. ACORN, therefore, prepared two leaflets identifying these defective conditions as (1) the need for neighborhood clinics, which ACORN believed the Board of Managers of the District opposed; (2) improved waiting room conditions; (3) reduced waiting time at Parkland; (4) Spanish-speaking employees in the clinic; and (5) additional parking for patients and their families.[7]

## II. The Prior Restraint

### A. The No Solicitation Rule

In 1967 the Board of Managers of the Defendant District adopted the no solicitation rule which is challenged in this lawsuit. The rule states:

"For the protection of our employees and patients, solicitation of any kind on hospital premises is prohibited without prior written approval of the Hospital Administrator."

The purpose of the no solicitation rule is to shield patients, their families, and employees from potentially disruptive influences unrelated to the health care function of the hospital. Other hospitals have similar no solicitation rules.

The Board interprets the no solicitation rule to prohibit distribution of written material on hospital property both inside and outside the buildings. The rule, of course, does not ban solicitation on public property around the hospital, such as the city streets, sidewalks, and public parking lots.

The current Administrator testified that he does not refuse permission to distribute written material because he disagrees with its content. Since the adoption of the no solicitation rule no Administrator has ever approved the distribution of leaflets or pamphlets by an outside group.

The hospital staff believes that distribution of literature not related to health care would be disruptive and incompatible with the hospital's health care function.

### B. ACORN Activity at Parkland Hospital

ACORN members twice went to Parkland Hospital in September, 1978. Both times the Administrator asked them to leave and they did leave peacefully. ACORN did not seek the prior approval of the Administrator on either occasion. The first time about forty-five ACORN members convened in the main lobby on the first floor to read a statement criticizing conditions at Parkland. This event was covered by two local television stations and the press. A crowd gathered in the lobby which obstructed the flow of traffic across the lobby to the clinics

---

7. One of the leaflets, which was less controversial than the other, was two typed pages. This leaflet promoted neighborhood health clinics, criticized the Board's opposition to these clinics, and listed some of the other concerns of ACORN about Parkland. Most of the testimony related to the possible detrimental effects on patients of the second leaflet. At the top of this one page leaflet is a large bold faced caption saying, "How long have you been waiting for decent health care?" Under the caption is a cartoon depicting the patient waiting area. The doctor at the door is shouting, "Next!" to the only occupant of the waiting room—a skeleton draped in a chair with cobwebs over its head. Under this graphic cartoon is a short demand for neighborhood health clinics, a notice of an ACORN meeting at Parkland, and a list of some other health care issues.

on the first floor. About ten days later six to eight ACORN members entered the first floor of the Outpatient Clinic and attempted to distribute their leaflets to people in the waiting room.

ACORN concedes leafleting in patient rooms or other areas of immediate patient care would be inappropriate but asserts the more public area of the hospital, e. g., waiting rooms, should be open for distribution of leaflets.

### III.  Public Hospital:  Public Forum?

■ As a prior restraint on speech the hospital's no solicitation rule carries a heavy presumption against its validity. *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971). Prior restraints against leafleting are particularly suspect because of the importance of pamphleteering in the birth of liberty in this country. *Lovell v. Griffin*, 303 U.S. 444, 451, 58 S.Ct. 666, 82 L.Ed. 949 (1938). However, simply stating that prior restraints on speech are presumptively invalid does not establish the analytical framework for a first amendment case. Recent Supreme Court cases suggest a three step approach for analyzing freedom of speech cases. *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974); *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). The court must first determine if the activity is the type of speech protected by the first amendment. If the activity is protected speech, the court must next decide whether the proposed forum is a public forum; that is, whether it is an appropriate forum for the speech. If the court concludes that the proposed forum is not a public forum, the analysis stops there. If the court concludes that the area is a public forum, it must then balance first amendment rights against the interests of the state in regulating the speech.

■ This analytical framework is overlaid with several well established principles of first amendment law. The previously mentioned presumption against prior restraints is one of these principles. Another tenet is that first amendment guarantees are not absolute; a person does not have a constitutional right to speak whenever and however and wherever he or she pleases. *Adderly v. Florida*, 385 U.S. 39, 48, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); *Greer v. Spock*, 424 U.S. at 836, 96 S.Ct. 1211 (1976). The corollary of this principle is that first amendment activity can constitutionally be subjected to reasonable time, manner, and place regulations, and in some cases prohibited. *Hudgens v. NLRB*, 424 U.S. 507, 520, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); *Grayned v. City of Rockford*, 408 U.S. at 115, 92 S.Ct. 2294 (1972). Still another principle is that discretionary rules resulting in discrimination on the basis of content may more likely violate the first amendment than a total ban. *Cf. Police Department v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (violation of equal protection to distinguish between labor picketing and other peaceful picketing); *but see Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (not unconstitutional to allow commercial advertising and yet ban political advertising on city buses).

■ Applying the three step analysis to this case, the Court concludes that ACORN's leafleting at Parkland Hospital is the kind of activity protected by the first amendment. *See Organization for a Better Austin v. Keefe*, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971). If this activity took place in a traditional public forum, there would be no question of its propriety.

We therefore turn next to whether the proposed forum—Parkland Hospital—is a public forum. On that issue, which is decisive, this case is one of first impression.

■ Before examining the holdings of the U.S. Supreme Court and other federal courts regarding public forums, we mention some principles useful in analyzing the public forum concept. The concept is a relatively recent adjunct to first amend-

ment freedom of speech law.[8] It is difficult to state precisely what proof is relevant to proving that a particular place is a public forum. Public ownership or public admittance is a threshold requirement for a public forum, but a place is not a public forum simply because it is publicly owned or because the public is permitted to be there. *Greer v. Spock*, 424 U.S. at 836, 96 S.Ct. 1211 (1976); *Adderly v. Florida*, 385 U.S. at 47, 87 S.Ct. 242 (1966). Underlying the public forum concept is a rationale that there are some places in a community which are inherently inappropriate for certain kinds of first amendment activity.

In deciding the public forum question two tests have been used—historical and realistic. The historical test looks back in time to discern if the forum in question has historically been a place for public speech. *See Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). The historical test should not be the exclusive measure of what is a public forum; it places a time lock on the Constitution. The realistic test examines the present activity in the forum and can suitably be used in conjunction with the historical test. *See Lehman v. City of Shaker Heights*, 418 U.S. at 302–04, 94 S.Ct. 2714 (1974); *Grayned v. City of Rockford*, 408 U.S. at 115–19, 92 S.Ct. 2294 (1972). The realistic test requires determining the character and primary normal activity of the forum. If first amendment activ-

ity is not fundamentally incompatible with that character and activity, then the place is a public forum. Justice Powell concurring in *Greer v. Spock*, 424 U.S. at 843, 96 S.Ct. at 1220 (1976), stated the realistic test this way:

> The Court is to inquire "whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." . . . [I]t is not sufficient that the area in which the right of expression is sought to be exercised be dedicated to some purpose other than use as a "public forum," or even that the primary business to be carried on in the area may be disturbed by the unpopular viewpoint expressed. Our inquiry must be more carefully addressed to the intrusion on the specific activity involved and to the degree of infringement on the first amendment rights of the private parties. *Some basic incompatibility must be discerned between the communication and the primary activity of an area.* (Emphasis added).

The alignment of the public forum cases illustrates the application of these two tests to particular forums. The courts have concluded that the following places are public forums for certain first amendment activities: streets; sidewalks and parks[9]; schools[10]; public transportation facilities[11]; welfare office waiting rooms[12]; state capitol grounds[13]. The

---

8. A discussion of the public forum concept first appears in the dissenting opinion of *Adderly v. Florida*, 385 U.S. 39, 53–55, 87 S.Ct. 292, 17 L.Ed.2d 149 (1966), written by Justice Douglas. The earliest academic statement on the public forum analysis, is Kalven, "The Concept of the Public Forum", 1965 Sup.Ct.Rev. 1. See Note, "The Public Forum: Minimum Access, Equal Access, and the First Amendment", 72 Yale L.J. 877 (1975), for an update on the public forum analysis through *Lehman*; and Horning, "The First Amendment Right to a Public Forum," 1969 Duke L.J. 931.

9. *Flower v. United States*, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972); *Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *Hague v. CIO*, 307 U.S. 976, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

10. *Tinker v. Des Moines Ind. Comm. School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *cf. Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (reasonableness of an antinoise ordinance regulation as applied to picketing outside a school).

11. *Wolin v. Port of N.Y. Auth.*, 392 F.2d 83 (2d Cir.) *cert. denied* 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968) (bus station); *Chicago Area Military Project v. Chicago*, 508 F.2d 921 (7th Cir.), *cert. denied*, 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975) (airport).

12. Both *Albany Welfare Rights Org. v. Wyman*, 493 F.2d 1319 (2d Cir.) *cert. denied*, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974), and *Unemployed Workers Union v. Hackett*, 332

courts have held that the following are not public forums: jails[14]; military bases[15]; city buses[16].

■ In the light of these cases this Court concludes that a public hospital is not a public forum. There is no evidence in the record, and the Court can conceive of none, to show that a hospital has historically been a forum for any kind of protected speech. In fact, it is part of our history to regard the hospital as a haven sheltered from outside noises and activities.

The realistic test likewise supports this conclusion. The purpose and primary activity of Parkland is rendering quality health care. Quality health care requires there be no impediment to the speed with which it is given and no disturbing influences on the patients. There is a "basic incompatibility" between leafleting in the public areas of a hospital and the rendition of health care. This incompatibility arises both from the type of first amendment activity—physical distribution of leaflets—and the possible detrimental effect on patients from the content of the leaflets. Distribution of leaflets in the already overcrowded waiting rooms and halls of Parkland could interfere with health care. Accosting ill patients to hand them a leaflet—whether in the parking lot, lobbies, clinic waiting rooms or other hospital areas—could be detrimental to their health. Every day some outpatients are so ill that they must be admitted to the hospital.[17] The treatment and teaching sessions that occur in the waiting rooms might easily be disrupted by people distributing leaflets. Medical experts also felt that literature critical of the hospital could induce the patient to leave and not receive treatment. The patient who left Parkland might not receive care anywhere else because Parkland is the principal place for indigent health care in Dallas County.

In addition to the dangers to a patient's physical health, the medical experts expressed concern for the patients' mental and emotional health. The testimony showed that sick persons frequently react adversely and unpredictably to unexpected stimuli. Sick persons are anxious and need to be protected from possibly harmful distractions. The content of written material may be particularly disturbing to an ill patient if critical of the patient's medical care. ACORN can make the distinction between criticism of medical care and the conditions under which that care is rendered but this distinction may be less clear to a sick and indigent patient.

Dicta from several decisions support the conclusion that a public hospital is not a public forum for first amendment activity. The Supreme Court in *Lehman v. City of Shaker Heights*, 418 U.S. at 304, 94 S.Ct. 2714, so implied, as have several lower courts. *United States v. Douglass*, 579 F.2d 545, 549 (9th Cir. 1978); *Chicago Area Military Project v. City of Chicago*, 508 F.2d 921, 925 (7th Cir.), *cert. denied* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975); *ISKON v. Schrader*, 461 F.Supp. 714, 718 (N.D. Tex.1978).

Two recent Supreme Court decisions in the analogous area of union solicitation are particularly instructive regarding the protected status of hospitals. *NLRB v. Baptist Hospital*, —— U.S. ——, 99 S.Ct. 2598, 61 L.Ed.2d 251 (1979); *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978). These two cases examined the NLRB presumption against the validity of hospital rules limiting union solicitation of hospital employees. Both cases emphasize hospitals should be treated differently from other forums for union solici-

F.Supp. 1372 (D. R.I.1971), struck down no solicitation rules which prohibited leafleting in welfare waiting rooms.

13. *Edwards v. S. C.*, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

14. *Adderly v. Fla.*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966).

15. *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976).

16. *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974).

17. About 4.7% of the patients admitted each month to the hospital come from the Outpatient Clinic.

tation because of the overriding concerns for health care and the welfare of the patients. *See NLRB v. Baptist Hospital*, 99 S.Ct. at 2606–2607, & n.16, 61 L.Ed.2d at 261–263, & n.16, and Chief Justice Burger's concurring opinion; *Beth Israel Hospital v. NLRB*, 437 U.S. at 498–99, 505, 508, 98 S.Ct. 2463, and the separate concurring opinions of Justice Blackmun and Justice Powell. A passage from *Beth Israel* eloquently expresses the rationale for this Court's conclusion that leafleting is incompatible with the purpose and primary normal activity of a hospital:

> Hospitals, after all, are not factories or mines or assembly plants. They are hospitals, where human ailments are treated, where patients and relatives alike often are under emotional strain and worry, where pleasing and comforting patients are principal facets of the day's activity, and where patient and his family—irrespective of whether that patient and that family are labor or management oriented—need a restful, uncluttered, relaxing and helpful atmosphere, rather than one remindful of the tensions of the marketplace in addition to the tensions of the sick bed.

437 U.S. at 509, 98 S.Ct. at 2478 (Blackmun, J., concurring). Since the Supreme Court clearly calls for protection of patients who would be merely bystanders to union solicitation, it follows that even more protection of patients is required when—as in this case—they are the targets of the solicitation.

Plaintiffs recognize some incompatibility between their leafleting and the primary activity of certain places in the hospital. They realize it would be inappropriate to leaflet in some areas, e. g., hospital rooms and treatment areas, but insist it would be appropriate to leaflet in more public areas, such as clinic waiting rooms. Plaintiffs propose, in effect, that this Court strike the no solicitation rule as overly broad and fashion a solicitation rule with the first amendment in one hand and a floor plan of the hospital in the other. This the Court declines to do.

The Court is of the opinion the hospital must be considered in its entirety as an institution whose purpose and primary normal activity is health care. Patients in varying degrees of health, their families, and health care professionals flow through all parts of the hospital. This court cannot make the requisite medical judgment as to which patients are well enough to be unaffected by the proposed solicitation. *Cf. Parham v. J.L.*, —— U.S. ——, 99 S.Ct. 2493, 2506–08, 61 L.Ed.2d 101, 122–25 (1979) (psychiatrists better qualified than judges to decide if child is mentally or emotionally ill). Nor is it possible to determine solicitation in a given area of the hospital would never affect a patient or the rendering of health care in another area.

Plaintiffs argue the public areas of the hospital are an appropriate public forum because there is no alternative forum in which to reach the relevant audience. This argument derives from a Second Circuit case, *Albany Welfare Rights Organization v. Wyman*, 493 F.2d 1319, *cert. denied*, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974). Plaintiffs contend they are promoting better health care for indigents and their most relevant audience is found in the environs of the primary facility for indigent health care, Parkland Hospital. However, the similarity between *Wyman* and this case is not compelling. Patients in the hospital are more similar to the "captive audience" protected by the Supreme Court in *Lehman v. Shaker Heights*, 418 U.S. at 302, 307–08, 94 S.Ct. 2714 (Douglas, J., concurring). In *Lehman* the plurality of the Court reasoned that bus riders were a captive audience and were entitled to protection from the intrusion on their privacy resulting from political advertising. Parkland patients waiting for medical care are clearly even more captive than the bus riders because the patients can only escape the intrusion by leaving and thus possibly injuring their health.

In any event, just because Parkland Hospital may be the best forum does not mean it is a constitutionally protected forum. Indeed, the presence of alternative forums

undercuts Plaintiffs' argument. The vast majority of the hospital's patients live in identifiable sections of the county, primarily in urban areas in the City of Dallas. Over one-third of the outpatients live in three zip code zones of Dallas. ACORN could leaflet in those areas. Additionally, there are the obvious alternatives of statements to the media and speaking at the open meetings of the Board of Managers of the District.[18] Of course, this decision does not purport to deny Plaintiffs access to the public streets, public parking lots, or bus stops in the vicinity of Parkland complex. *See ISKON v. Schrader*, 461 F.Supp. at 718 (N.D.Tex.1978).

Parkland is not a public forum for first amendment activity. Parkland's no solicitation rule, applied nondiscriminately, does not violate the first amendment and is constitutional.

Judgment will be entered for defendant.

---

18. In the record are several newspaper articles describing ACORN's views on health care at Parkland and noting their presence at Board meetings to speak on these issues. These articles show ACORN has used other forums for expressing its views.