DALLAS ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW, et al., Plaintiffs-Appellants,

v.

DALLAS COUNTY HOSPITAL DISTRICT, Defendant-Appellee.

No. 79–3967.

United States Court of Appeals, Fifth Circuit.*
Unit A

March 19, 1982.
Rehearing and Rehearing En Banc Denied June 18, 1982.

---

\* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Roger Albright, Dallas Legal Services Fdn., Inc., Dallas, Tex., for plaintiffs-appellants.

Mary F. Keller, American Civil Liberties Foundation of Texas, Inc., Austin, Tex., amicus curiae for Texas Civil Liberties Union.

Robert L. Schwartz, Chicago, Ill., amicus curiae for American Hospital Ass'n.

Earl Luna, Dallas, Tex., Thomas V. Murto, III, for defendant-appellee.

ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

Before BROWN, COLEMAN and GEE, Circuit Judges.

PER CURIAM:

On petition for rehearing en banc, the Dallas Association of Community Organizations for Reform Now (ACORN) has challenged our opinion, 656 F.2d 1175 (5th Cir. 1981), in which we declined to reach the question of the constitutionality of the "no solicitation" rule. The facts in this dispute are adequately set forth in that opinion. Upon reconsidering the matter, and for the reasons set forth below, we modify that opinion, vacate our affirmance of the District Court's, 478 F.Supp. 1250, holding, and reverse and remand on that issue. We now hold that the District Court should pass on the constitutionality of that rule in light of the principles discussed in the remainder of this opinion.

The Supreme Court recently reaffirmed that ·activities protected by the First Amendment "are subject to reasonable time, place, and manner restrictions." *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298, 306 (1981). Although the District Court found that Parkland Hospital is not a public forum, 478 F.Supp. at 1257, we held that a hospital owned by the state is a public forum but one whose use may be limited by

the state by reasonable restrictions.[1] Obviously, regulations must exist so that the primary purpose of a medical facility may be fulfilled and not impeded, but such restrictions must be both reasonable and not based on content.[2] Our concern in the present controversy has been and remains the necessity of preventing disruptive activity in the crowded front lobby of Parkland, the waiting room, the outpatient clinic, and the emergency treatment area, as well as any other area for patient treatment. However, we also recognize that Parkland's premises cover 23 acres, including over 1,000 feet of sidewalks and several large parking lots. Thus we must attempt to find the middle way between absolute prohibition of free speech activities in a limited public forum, and disruptive expressions that interfere with the purpose, function and administration of a hospital.

■ The troublesome "no solicitation rule" applied by Parkland administrators to prevent ACORN from distributing their literature prohibits "solicitation of any kind"

on Parkland's premises "without prior written approval of the hospital administration." Neither the hospital board nor the administrator has adopted any rules concerning the conditions on which approval may be granted or withheld, nor have any guidelines been established as to what types of literature may or may not be distributed. Testimony by the administrator indicated that newspapers and pamphlets from groups other than ACORN are permitted to be placed in the hospital on the basis that they are unlikely to cause anxiety to patients when sold in various parts of the hospital or placed in a reading rack in the outpatient waiting room. Upon reconsideration of this rule, we find that it is unconstitutional because (i) the hospital administration cannot forbid the distribution of literature, based on its content, throughout the entire hospital area, and (ii) the hospital administration cannot delegate unfettered discretion to the administrator to interpret the rule by making his own decision about the acceptability of the content of the literature.[3]

1. The Supreme Court, in *N. L. R. B. v. Baptist Hospital, Inc.*, 442 U.S. 773, 787–88, 99 S.Ct. 2598, 2606–07, 61 L.Ed.2d 251, 264–65 (1979), stated that "solicitation in at least some of the public areas of hospital often will not adversely affect patient care or disturb patients."

2. In the context of hospital regulations, some writers might find the "not based on content standard" "both theoretically questionable and difficult to apply." *See* Redish, *The Content Distinction in First Amendment Analysis*, 34 Stan.L.Rev. 113 (1981). This difficulty arises out of a commingling of two concepts. The hospital may adopt non-content-related restrictions, tempered by reasonable time, place, and manner rules. If it seeks *in addition* to impose restrictions based on content, the regulations are governed by different standards. "A regulation that regulates only the time, place or manner of speech may be imposed so long as it's reasonable. But when regulation is based on the content of speech, governmental action must be scrutinized more carefully to ensure that communication has not been prohibited 'merely because public officials disapprove the speaker's views.'" *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 535–36, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319, 326–27 (1980) (quoting *Niemotko v. Maryland*, 340 U.S. 268, 282, 71 S.Ct. 325, 333, 95 L.Ed. 267, 280 (1951) (Frankfurter, J., concurring in the result)).

Thus, a hospital might adopt a regulation prohibiting the distribution in patient's rooms of literature that exclaimed in pejorative terms that the surgeons are "butchers trying to kill patients." In such a case, the medical need to protect patients from emotional disturbance might warrant some content regulation, for "[e]ven within the area of protected speech, a difference in content may require a different governmental response." *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 66, 96 S.Ct. 2440, 2450, 49 L.Ed.2d 310, 323–24 (1976) (plurality opinion). The central question would be "'whether the manner [and, we add, content] of expression is basically incompatible with the normal activity of a particular place at a particular time.'" *Greer v. Spock*, 424 U.S. 828, 843, 96 S.Ct. 1211, 1220, 47 L.Ed.2d 505, 517–18 (Powell, J., concurring) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222, 232 (1972)); *see id.* at 840, 96 S.Ct. at 1218, 47 L.Ed.2d at 515 (majority opinion).

3. Such "discretion has the potential for becoming a means of suppressing a particular point of view." *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 649, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298, 307 (1981).

■ We reaffirm the principle that the board of a hospital, operating public property devoted to a particular purpose, may adopt rules to preserve the property for the use for which it is lawfully dedicated, but they may not completely forbid freedom of expression on the hospital grounds. The Supreme Court, in *Consolidated Edison Company v. Public Service Commission*, 447 U.S. 530, 535, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319, 326, 327 (1980),

> recognized the validity of reasonable time, place, or manner regulations that serve a significant governmental interest and leave ample alternative channels for communication.... Thus, the essence of time, place, or manner regulation lies in the recognition that various methods of speech, regardless of their content, may frustrate legitimate government goals. No matter what its message, a roving soundtrack that blares at 2 a. m. disturbs neighborhood tranquility.

The First Amendment is violated by unreasonable and unequal restrictions on access to public property, as well as by the delegation of authority to a single person to determine who may use public property for free speech. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162, 167 (1969).

■ What may be forbidden is expression that interferes with the functioning of the hospital. An acceptable rule would prevent only those expressions that are basically incompatible with the normal activity of a particular place at a particular time. *See Greer v. Spock*, 424 U.S. 828, 838, 96 S.Ct. 1211, 1220, 47 L.Ed.2d 505, 514 (1976).

We hold that the rules at Parkland with regard to solicitation or leafletting must define by objective standards the literature that is forbidden because of the potential interference with the hospital's administration. Parkland need not allow disruption of

the hospital or interference with patient care—by proper rules, with fixed standards, such disruption can be forbidden.[4] The present rule, however, which contains no time, place, and manner guidelines, and which is applied by the hospital administrator at his discretion, must be held unconstitutional.

Given the overcrowded and congested conditions at Parkland, a precisely-drawn rule could constitutionally prohibit all solicitation and leafleting in its small and crowded front lobby, its busy outpatient clinic, and the various waiting rooms where, because of lack of space, certain necessary medical services (teaching patients, recording patient histories, taking patients' vital signs, administering medications, drawing blood, etc.) must be provided. We find that the significant governmental interest inherent in providing medical care to the public justifies certain carefully drawn restrictions on freedom of expression. *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672, 680 (1968). Interference with the operation of Parkland's services need not be tolerated. *Carey v. Brown*, 447 U.S. 455, 470, 100 S.Ct. 2286, 2296, 65 L.Ed.2d 263, 276 (1980). For example, literature distributed among patients, awaiting medical care, that stated that the doctors are incompetent and will do more harm than good could quite easily cause further disturbances to those already suffering ailments. On the other hand, a public hospital's rules should set forth standards that allow some freedom of expression outside patient areas, for example on the sidewalks and in the parking lots, that would cause little harm or disturbance to the hospital's operation. Thus, we are not chastising Parkland for its sensitivity to patient needs, but we are, under clearly established constitutional principles, requiring that standards must be set forth that are consistent with

---

**4.** A hospital such as Parkland "may serve its legitimate interests, but it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedom.... 'Broad prophylactic rules in the area of free expression are suspect. Precision of regulation

must be the touchstone....'" *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 637, 100 S.Ct. 826, 836, 63 L.Ed.2d 73, 87–88, *quoting NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405, 421 (1963).

both patient needs and freedom of expression.[5] Moreover, some machinery for review must exist so that decisions by the administration as to what areas are susceptible to disruption might be challenged.

The present "no solicitation rule" at Parkland is not vague—no solicitation at all is permitted. However, in application, it is clear that some literature is allowed on the premises of Parkland. Thus it becomes vague because those seeking to place their literature or leaflets in the waiting rooms of the hospital have no idea whether their expressions constitute "solicitation" under the "no solicitation rule".

· The present "no solicitation rule" is also overbroad in that it potentially reaches and restricts every single mode of expression, including pure speech. Thus, even expressions that could in no way disrupt the purposes of the hospital could be prohibited under the rule if they were determined by the hospital administrator to constitute solicitation.

In conclusion, we affirm the District Court's findings that (i) ACORN's activities are protected by the First Amendment, subject to reasonable time, place, and manner restrictions, and (ii) that ACORN activities including solicitation or the distribution of leaflets, are incompatible with the primary activities of all areas where patient care is being administered.[6] We reverse both the District Court's finding that Parkland is not a public forum and its holding that Parkland's "no solicitation rule" is constitutional. The case is remanded to the District Court for reconsideration and a decision in accordance with the principles set forth above. Except insofar as explicitly granted in this per curiam opinion, it is ordered that the petition for rehearing is denied. No member of the panel nor Judge of this Administrative Unit in regular active service having requested that the Court be polled on rehearing en banc (Rule 35, Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 16; Fifth Circuit Judicial Council Resolution of January 14, 1981), the suggestion for Rehearing En Banc is DENIED.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

COLEMAN, Circuit Judge, dissenting.

I believe that our prior opinion in this case, which was expressly limited to its facts, correctly stated the law applicable to those facts. Therefore, I would not extend the decision beyond the actual issue in the case.

More particularly, in the absence of a Supreme Court decision to the contrary, I would hold that a hospital—designed, constructed, and operated for the sole purpose of treating human ills—is not a public forum. The overriding function of such a unique institution should not be subjected to a room to room, place by place, analysis for the promulgation of some kind of a limited rule as to those particular areas. Overworked, understaffed personnel of hospitals should not have their mission diverted by such stumbling blocks. No real First Amendment right is promoted by allowing it. The privacy of and a reasonably tranquil atmosphere for sick people, and the

---

5. As the Supreme Court stated in *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 2299, 33 L.Ed.2d 222, 227–28 (1972),

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.... Vague laws may trap the innocent by not providing fair warning ... A vague law impermissibly delegates basic policy matters ... for resolution on an *ad hoc* and subjective basis with the attendant dangers of arbitrary and discriminatory application.... [Where] a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "op-

erates to inhibit the exercise of [those] freedoms." [footnotes omitted]

6. ACORN recognizes that it would be inappropriate to leaflet in some areas, but insists that the more public areas, such as clinic waiting rooms, are proper forums for its activities. This abstract argument fails to take into account the overcrowded and congested conditions at Parkland. Under such circumstances, it may be necessary to provide medical care to patients even in areas originally designated as visitors' lobbies, or patients' waiting rooms. These factors must be considered in any assessment of the interference caused by solicitation or leafleting.

efforts to help them if not always to cure them, ought not to be hampered by the necessity for specially tailored handling, which may survive the hair splitting analysis fostered by litigation. Let all propagandizers, of whatever purpose or ilk, stand clear of the last refuge of the sick.

I respectfully dissent.