866 F.2d 788
 MISSISSIPPI WOMEN'S MEDICAL CLINIC, Individually, and on
Behalf of All Others Similarly Situated,
Plaintiffs-Appellants Cross-Appellees
v.
Roy McMILLAN, William Conlee, Individually, and in His
Official Capacity as a Police Officer of the City of
Jackson, Mississippi, and Mississippi Right To Life, Inc.,
Defendants-Appellees Cross-Appellants.
 No. 88-4311.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 28, 1989.
 
 Shirley Payne, Jackson, Miss., for plaintiffs-appellants cross-appellees.
 William Conlee, Jackson, Miss., pro se.
 Edward L. Walsh, Mississippi Right to Life, Inc., Jackson, Miss., for Mississippi Right to Life, Inc.
 Matthew Moore, City Attorney's Office, Jackson, Miss., for Conley--in his capacity as City Police Officer.
 Douglas E. Barfield, Walter E. Wood, Ridgeland, Miss., for Ray McMillan.
 Appeals from the United States District Court for the Southern District of Mississippi.
 Before WISDOM, GEE and RUBIN, Circuit Judges.
 GEE, Circuit Judge:
 
 
 1
 Mississippi Women's Medical Clinic ("MWMC") appeals the denial by the district court of a preliminary injunction prohibiting abortion protestors from picketing its clinic, contending that the picketers' advocacy abridges the privacy rights of women seeking to have abortions performed there, creates an "atmosphere" that intimidates women patients, and effectively denies them their rights to abortions. The protestors assert their rights to express their views on an issue of public concern in a public forum--the street. The appeal presents a conflict between competing rights declared by the Court to be constitutional ones: freedom of expression and the right to have an abortion.
 
 Background
 
 2
 MWMC wants to protect the right of its clients to obtain an abortion and to do so in utmost privacy. The protestors seek to confront women with the consequences of such a decision before they enter the clinic. On the public sidewalk in front of the clinic, the protestors march carrying signs condemning the slaughter of the unborn and displaying stark photographs of aborted fetuses. According to MWMC, the protestors create sufficient noise to be heard inside the clinic and to dissuade some from having abortions. In addition, MWMC asserts that the protestors have trespassed on its property and vandalized its signs. In consequence, MWMC seeks to prevent the protestors from approaching within 500 feet of the clinic and to control the language employed in their protests, forbidding the use of such terms as "kill," "murder," and "butcher." Only by issuing the preliminary injunction and by moving the protestors away from the clinic, MWMC contends, can women be enabled to receive the care they seek and the clinic's property be rendered secure.
 
 
 3
 Prerequisites for Issuing a Preliminary Injunction
 
 
 4
 Our Circuit has termed the remedy that MWMC seeks an "extraordinary" one, holding that "[i]t should only be granted if the movant has clearly carried the burden of persuasion on all four Callaway prerequisites." Mississippi Power & Light v. United Gas Pipeline, 760 F.2d 618, 621 (5th Cir.1985). These are:
 
 
 5
 (1) a substantial likelihood that [MWMC] will prevail on the merits, (2) a substantial threat that [MWMC] will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to [MWMC] outweighs the threatened harm injunction merits to [the protestors] and (4) that granting the preliminary injunction will not disserve the public interest.
 
 
 6
 See Canal Authority of State of Florida v. Callaway, 489 F.2d 567, 572 (5th Cir.1974). Since the "decision to grant or deny a preliminary injunction is discretionary with the district court[,] the standard we must apply in reviewing [these prerequisites] is whether the district court's decision constitutes an abuse of discretion." Mississippi Power & Light, 760 F.2d at 621. Our review of the record and of case law indicates that MWMC did not carry the burden of persuasion on the Callaway prerequisites and, therefore, that the district court did not abuse its discretion in denying the injunction. Hence we affirm.
 
 
 7
 A. Likelihood of Success on the Merits.
 
 
 8
 MWMC contends under 42 U.S.C. Secs. 1983, 1985(3) and 1986 that the protestors are violating the constitutional rights of its potential patients. We examine these statutes in numerical order.
 
 1. Section 1983
 
 9
 A successful claim under Sec. 1983 requires a showing of two elements: (1) deprivation of a right, privilege or immunity secured by the federal laws or Constitution (2) by one acting under color of state law. See Flagg Brothers v. Brooks, 436 U.S. 149, 155, 98 S.Ct. 1729, 1732-33, 56 L.Ed.2d 185 (1978).
 
 
 10
 There is no record evidence that anyone has been deprived of a constitutional right to choose an abortion. MWMC argues, though, that the protestors, by their advocacy, created an atmosphere of psychological intimidation. MWMC points out that as the potential patients entered the clinic's property protestors, such as Dr. Beverly McMillan, would stand in front of the driveway and distribute literature and gratuitous counselling to potential patients against having an abortion. In addition, the protestors made so much noise that they could be heard inside the clinic. Some patients became emotionally agitated, and some chose to leave the clinic.
 
 
 11
 The clinic offers no evidence, however, that the protestors physically restrained potential patients from entering the clinic.[1] Indeed, the fact that some women did obtain abortions from the clinic demonstrates that, while the atmosphere may not have been the most conducive to doing so, that option remained available. This situation stands in sharp contrast to that of Northern Virginia Women's Medical Center v. Balch, 617 F.2d 1045 (4th Cir.1980) where the citizens group protesting abortion were enjoined from trespassing in "entering upon the clinic's premises, blocking doors to procedure rooms and blocking access to the Center." Id. at 1048.
 
 
 12
 In the case before us, MWMC contends that the protestors had no right to create the tense and agitated atmosphere that surrounded the clinic, a position often advanced in the courts and as often rejected. Rather, "[i]t is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." Spence v. Washington, 418 U.S. 405, 412, 94 S.Ct. 2727, 2731, 41 L.Ed.2d 842 (1974) (quoting Street v. New York, 394 U.S. 576, 592, 89 S.Ct. 1354, 1366, 22 L.Ed.2d 572 (1969)). Unlike Northern Virginia Women's Medical Center, the clash in this case is one between constitutional rights defined by the Supreme Court: an old one tracing its roots to the speech clause of the First Amendment and before, and a new one stemming from Roe v. Wade.
 
 
 13
 Because no local ordinance attempts to limit the public expressions of the protestors, and also because potential patients could come and go as they pleased and thus could avoid the communications, it is not possible for us to choose between those who believe in, and may wish to exercise, the right to have an abortion and those who believe that other rights are involved and wish to make this opinion known peaceably, if loudly.
 
 
 14
 The clash between these competing groups is a private one. MWMC fails to show that the protestors were acting under color of state law and as a result fails to satisfy the second prong needed to establish a claim under Sec. 1983.
 
 
 15
 As evidence of state involvement in depriving its potential patients of their constitutional rights, MWMC showed that William Conlee, one of the protestors, was a police patrolman and suggested that he exercised apparent authority in behalf of the Jackson, Mississippi Police Department.[2] Moreover, the clinic claims that the police department did nothing to discourage the public perception that it supported the protestors. The record indicates, however, that the purported incidents of state involvement were either unsubstantiated or so inconsequential as to be meaningless. MWMC first points out that Mr. Conlee wrote a "threatening" letter[3] to one of the clinic's doctors on a letterhead identified with the Jackson Police Department. Upon inspection, the letterhead does bear the address of the Jackson Police Department. It is clear, however, that the letter is from a group that, while affiliated with the police department, is still distinct from it. Written in large letters across the top of the page are the words "Jackson Police Officers Christian Fellowship." There is no indication that this chapter of the Christian Fellowship sets policy for the police department or in fact affects the official behavior of any of its members.
 
 
 16
 Rather, on deposition the clinic's director conceded that the police had never failed to answer any call by the clinic to control the protestors. In addition, she acknowledged that the police officer, one Bradford, whom she had complained blocked the clinic's driveway for 30-45 minutes and spoke to the protestors, actually was responding to a call by the clinic. Officer Bradford's actions seem more properly interpreted as a stabilizing influence in controlling these opposing factions. Finally, we note that the clinic's director acknowledged that she never saw Mr. Conlee in uniform while picketing out in front of the clinic. On one occasion only Mr. Conlee wore his patrolman's uniform in public--at a trial in connection with these matters,[4]--but this isolated instance does not change our overall evaluation that there is no evidence that Mr. Conlee or any other picketer acted, acutally or apparently, with authority of the Jackson Police Department.
 
 
 17
 In deciding whether there has been the state action necessary to support a claim under Sec. 1983, we have required that the state official affirmatively act in support of the violation. Thus "a person acts under color of state law only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " Thibodeaux v. Bordelon, 740 F.2d 329, 333 (5th Cir.1984) (emphasis added). Put another way, for state action the activity must amount to "police intervention and aid" of the private group. See Menchaca v. Chrysler Corp., 613 F.2d 507, 513 (5th Cir.1980).
 
 
 18
 On this settled understanding of state action, it is impossible to classify the conduct of the Jackson police as state action for Sec. 1983 purposes. The Jackson police officers did their duty in responding to calls by the clinic and in arresting protestors when necessary. The passive presence of Officer Bradford can only be interpreted as maintaining the peace. Finally, the failure of the police department to send written assurances to the clinic and to the doctor who had been sent a personal letter by Officer Conlee should be given no special significance. One may interpret such a posture by the police department as an attempt to remain neutral between the groups. By simply keeping the peace and declining to advance the cause of either the clinic or the protestors, the police department avoided being converted from a governmental agency into a state actor for purposes of establishing a claim under Sec. 1983. As the district court noted in today's case, "[a] state's mere acquiescence in a private action does not convert that action into that of the state." See Flagg Brothers, 436 U.S. at 164, 98 S.Ct. at 1737 ("[A] State is responsible for the ... act of a private party when the State, by its law, has compelled the act.") Because the MWMC has shown neither that women have been deprived of the right to have an abortion nor that anyone was acting under color of state law, it is unlikely that it will prevail on the merits.
 
 2. Secs. 1985(3) and 1986
 
 19
 MWMC next contends that 42 U.S.C. Sec. 1985(3) authorizes this Court to issue the preliminary injunction. Section 1985(3) prohibits private conspiracies to deprive a person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws. See 42 U.S.C. Sec. 1985(3). The Supreme Court, interpreting the legislative history of Sec. 1985(3), has added that in order to maintain such a cause of action, plaintiffs must show "a class-based, invidious discrimination"--the "central concern of Congress in enacting Sec. 1985(3)." United Brotherhood of Carpenters, Local 610 v. Scott, 463 U.S. 825, 835, 103 S.Ct. 3352, 3359, 77 L.Ed.2d 1049 (1983). In addition, the legislative history indicated that "class-based, invidious discrimination," was to be evaluated by focusing on "animus or motivation."[5] Id. at 834, 835, 103 S.Ct. at 3359. See also Griffin v. Breckenridge, 403 U.S. 88, 100, 91 S.Ct. 1790, 1797, 29 L.Ed.2d 338 (1971). In order to prove its claim under Sec. 1985(3), MWMC thus must show that the protestors were motivated by a (1) class-based (2) invidiously discriminatory animus. See Griffin, 403 U.S. at 102, 91 S.Ct. at 1798.
 
 
 20
 We have recently considered a similar situation in which, among others, two patients, two doctors, clinic staff, and the Dallas Medical Ladies Clinic brought a Sec. 1985(3) action against the Abortion Abolition Society and the city of Dallas. Roe v. Abortion Abolition Society, 811 F.2d 931 (5th Cir.1987). The plaintiffs claimed that the Society "threatened, harassed, intimidated and assaulted them while they were seeking family planning or abortion services." Id. at 932. In denying relief, we held that the plaintiffs, defining themselves as "those people who do not agree with the Society defendants' point of view," id. at 935, were not a class protected by Sec. 1985(3), any more than those who grouped themselves together as sharing "a belief in using seat belts or in an ever-expanding universe." Id. The plaintiff's "class" was too diffuse to have any meaning under the statute. The court did offer a clarifying criterion for evaluating such "class-based" claims under Sec. 1985(3): "The class protected by Sec. 1985(3) is thus defined by the characteristics of those at whom the conspiracy [was] aimed, not by the beliefs of the conspirators." Id. at 935.
 
 
 21
 MWMC maintains, perhaps learning from Abortion Abolition Society, that the relevant "class" being discriminated against is that consisting of "women of childbearing age who seek medical attention from the MWMC." Assuming arguendo that this grouping constitutes a class, MWMC still has not shown that the protestors acted with an invidious discriminatory animus against that particular class. Rather, the record indicates that the protestors do not target their pro-life advocacy at any particular group. The protestors (who are made up of both men and women) confront and try to persuade to their point of view all groups--men, women of all ages, doctors, nurses, staff, the female security guards, etc. In fact, MWMC's introduction of William Conlee's letter written to a male doctor indicates that the animus of the protestors is to dissuade anyone who contributes to the incidence of abortions. It is useful to reiterate that the legislative history indicates that Congress wanted to evaluate "class-based invidious discrimination" through the lens of "animus or motivation," not impact. See United Brotherhood of Carpenters Local 610, 463 U.S. at 834-35, 103 S.Ct. at 3359. Thus, if the plaintiffs in Abortion Abolition Society identified themselves as a class that was so over-inclusive as to be meaningless, MWMC in this case has designated a class that is so under-inclusive as to mischaracterize the dispute.
 
 
 22
 Further, not only does the MWMC fail to meet the requirements for a claim under Sec. 1985(3), but the underlying theory of the claim is misplaced. As we noted in Abortion Abolition Society,
 
 
 23
 Section 1985(3) prohibits private conspiracies to deprive persons or classes of persons equal protection of the laws or of equal privileges and immunities under the law, but, as held by the Supreme Court, in United Brotherhood of Carpenters, Local 610 v. Scott, it does not itself provide any substantive rights. Instead, the rights, privileges, and immunities protected by Sec. 1985(3) "must be found elsewhere." Section 1985(3) does not, therefore, protect individuals against private efforts to encroach on constitutional shields, such as the first amendment, that protect only against official conduct.
 
 
 24
 Roe v. Abortion Abolition Society, 811 F.2d 931, 933 (5th Cir.1987) (footnotes omitted) (emphasis added). MWMC ask us then, to issue a preliminary injunction against First Amendment activities of the protestors and to move the protestors 500 feet from the clinic under the theory of a time, place and manner restriction, despite the fact that there is no evidence of any local law restricting the expression of the protestors.[6]
 
 
 25
 What then is the substantive right that MWMC is asking that we protect under the jurisdiction of Sec. 1985(3)? Pregnant women may still receive an abortion at the clinic--equal protection of that right is secure. What the clinic must be complaining about is that potential patients are being denied a supposed right not to hear speech that they do not wish to hear. Such a right, in a public forum, would be a most unusual one.
 
 
 26
 To argue any other theory of the case--such as that women are being denied the substantive right to an abortion because of the "atmosphere created," (despite the fact that women are receiving abortions and that no one is being restrained)--would be to eviscerate the First Amendment. It would mean that any unregulated private group which argued against exercising a constitutional right--textual or fathomed--or against any law--statutory or common--would be in violation of Sec. 1985(3), so that those vested with the benefits of such a right, (and by definition there always will be some such beneficiaries) could redefine themselves as a class and claim insulation from such advocacy. For example, not long ago the law permitted child labor. If one took this hypothesis of MWMC's theory of the case, protestors against such labor would have to move away from any factory so that management and co-workers would not have to be intimidated by the "atmosphere" surrounding their choice to employ children.
 
 
 27
 Thus because MWMC has not shown that the protestors were motivated by a "class-based invidiously discriminatory animus," it is not likely that MWMC will prevail on the merits of a Sec. 1985(3) claim and thus meet a prerequisite for the court to issue a preliminary injunction. Moreover, because jurisdiction under Sec. 1986 depends on finding a claim under Sec. 1985, it too is then excluded as a basis for jurisdiction in this case.[7]
 
 
 28
 B. Threat of Irreparable Injury If Injunction Is Not Granted.
 
 
 29
 The district court assumed that the denial of the right to obtain an abortion at MWMC would constitute irreparable harm even if other abortion facilities were available. This assumption is correct to a degree. It is true that the clinic has the right to provide such services as the law permits. Thus any denial of the right, if available at the clinic, would be an irreparable harm. There is, however, no evidence of any physical threat to the clinic or physical restraint of its potential patients.
 
 
 30
 If the injunction is not granted, the protestors will continue in their advocacy and MWMC will still be open to perform abortions. As such, the right to an abortion will still be safeguarded. This, however, is the scope of our authority. Questions of business judgment with respect to the elasticity of demand for abortion services in the area are outside our concern in evaluating irreparable injury.
 
 
 31
 C. Balancing Threatened Harm to Plaintiff and Defendants.
 
 
 32
 This case presents a conflict between the First Amendment rights of the protesters to advocate a right-to-life position and the privacy interests of women who seek to have abortions performed at the clinic, while being insulated from the protesters advocacy. In examining the record, the district court correctly concluded that "granting the injunction would be substantially more likely to infringe on first amendment rights than denying the injunction would be to result in a denial of privacy rights."
 
 
 33
 The Supreme Court, in its First Amendment jurisprudence, has noted that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976). The Court, however, has upheld some local ordinances that restrain freedom of speech in balance against privacy interests. It has done so reluctantly and with great care, however, observing that:
 
 
 34
 Much that we encounter offends our esthetic, if not our political and moral, sensibilities. Nevertheless, the Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer ... the burden normally falls upon the viewer to "avoid further bombardment of [his] sensibilities simply by averting [his] eyes."
 
 
 35
 Erznoznik v. City of Jacksonville, 422 U.S. 205, 210-11, 95 S.Ct. 2268, 2273, 45 L.Ed.2d 125 (1975) (citations omitted) (emphasis added).
 
 
 36
 Most recently, and in the context of abortion protest, the Supreme Court upheld a local ordinance which banned picketing in front of residences. See Frisby v. Schultz and Braun, --- U.S. ----, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988).. Yet again, the Supreme Court carefully circumscribed its decision to abridge freedom of speech:
 
 
 37
 The antipicketing ordinance operates at the core of the First Amendment by prohibiting appellees from engaging in picketing on an issue of public concern. Because of the importance of "uninhibited, robust, and wide-open " debate on public issues ... we have traditionally subjected restrictions on public issue picketing to careful scrutiny.
 
 
 38
 Id. at ----, 108 S.Ct. at 2499 (emphasis added). In Frisby, the Court carved out for the "unwilling listener" the exception of residential privacy. "[T]he home is different ... individuals are not required to welcome unwanted speech into their own homes and ... government may protect this freedom." Id. at ----, 108 S.Ct. at 2502. Yet, though this exception was created, the Court was careful to point out that public streets were the archtype of a traditional public forum, id., and that to enforce there a content-based exclusion the Government had to show that "its regulation [was] necessary to serve a compelling state interest and that it [was] narrowly drawn to achieve that end." Id. (quoting Perry Education Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983)).
 
 
 39
 The Supreme Court's First Amendment jurisprudence tilts the scale assessing threatened harm decisively in favor of the protestors. Loss of First Amendment freedoms is considered an irreparable injury. Moreover, even when there has been a government ordinance--as there is not here--in regulating freedom of speech in a public forum, the Supreme Court has been reluctant to construe such regulations in such a way as to drain the life-blood of a democracy--"uninhibited, robust, and wide-open debate" on controversial public issues. By asking our Court to gag these protesters, MWMC seeks to push the regulation of speech further than any court has ever gone.[8]
 
 
 40
 The clinic wishes potential clients to be shielded from hearing advocacy with which it disagrees so that they will obtain abortions. But obtaining abortions is not in issue; the availability of abortion services at MWMC continues. The clinic's real complaint is that the choice has been made more difficult because of adverse information communicated to potential patients. Yet making choices more difficult is not the same as eliminating the right to choose. In fact, in a polity where the people are sovereign, informed choice enhances responsible decision-making.[9] Neither we nor the clinic can cut off the peaceful communication of information, distasteful to some though it be. Neither in the precedent of the Supreme Court, nor in that of ours, do we find the faintest hint that the "uninhibited, robust, and wide-open" debate on public issues extolled by Justice Brennan in New York Times v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964), is to be limited to "things that do not matter much," West Virginia State Board of Education v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943), or to the other fellow's cherished ideas and beliefs, not our own.
 
 
 41
 The Public Interest Prerequisite for a Preliminary
 
 Injunction and Conclusion
 
 42
 Given the preceding discussion, it is not likely that the public interest would be served by insulating potential abortion clients from the information, stark and unsavory though it may be, which these protestors seek to communicate. The right to choose abortion services at MWMC still exists, though the choice may be made harder because the wrapping is undone. The First Amendment retains a primacy in our jurisprudence because it represents the foundation of a democracy--informed public discourse. If the people are to choose wisely what laws they wish to live under and what rights and privileges are to be maintained, then neither the MWMC nor this Court must be permitted to cull and censor the information upon which their choices are to be made. Because MWMC has not carried the burden of persuasion on any of the four Callaway prerequisites, injunctive relief cannot be granted and the district court's refusal to do so is hereby AFFIRMED.
 
 ALVIN B. RUBIN, Circuit Judge, concurring:
 
 43
 I concur in the result. The issue before us is not the ultimate merit of the claims made by the Mississippi Women's Medical Clinic but whether the district court abused its discretion in refusing to issue a preliminary injunction because the clinic had not established the four prerequisites set forth by us in Canal Authority of State of Florida v. Callaway.[1] The clinic has not shown the likelihood of success on its Sec. 1983 claim for the reasons stated in my brother Gee's summary of the evidence on the state-action requirement.
 
 
 44
 The Clinic has failed also to establish the likelihood of success on the related Sec. 1985(3) and Sec. 1986 claims because it has failed to establish the existence of a "class" against which the animus of the protestors was directed, as required by United Brotherhood of Carpenters, Local 610 v. Scott[2] and Roe v. Abortion Abolition Society.[3] In addition, the clinic has failed to show that on the specific evidence before the court, the threatened harm to it consequent upon denial of the injunction outweighs injury to the First Amendment rights of the protestors.[4]
 
 
 45
 WISDOM, Senior Circuit Judge, concurring in part and dissenting in part:
 
 
 46
 With respect to the Sec. 1983 claim, I agree with my two colleagues that the clinic has not shown that there was any state action.
 
 
 47
 With respect to the Sec. 1985(3) claim, I would recognize as a protected class women seeking medical aid from the clinic. I would order an injunction under Sec. 1985(3) because of the coercive atmosphere generated by the protestors. I have confidence in the district court's ability to impose reasonable restrictions on the protestors relating to the time, place, and manner of continuing their protest.
 
 
 
 [1]
 There is evidence that on one occasion the director of the clinic received bruises on her arms as she tried to wrestle a sign away from a protestor. Relief for this isolated incident should be sought under state tort law rather than through Constitutional litigation
 
 
 [2]
 MWMC, however, does not seek to enjoin the City of Jackson but sues only William Conlee in his official capacity
 
 
 [3]
 In reviewing the contents of the letter, we are hard-pressed to find any "threatening" language. The only actions "threatened" in the letter were "peaceful picketing," "sidewalk counseling," and "prayer." Except for prayer, each of these actions is generally protected by the First Amendment. In addition, there is no evidence that this letter was anything more than an isolated occurrence, an expression of a personal view
 
 
 [4]
 Mr. Conlee admits that he wore his uniform to the trial of another protestor but points out that he was under subpoena to appear and to testify during his "on-duty" time. Mr. Conlee admits that he has been reprimanded by the police department for his abortion protest activities
 
 
 [5]
 The Supreme Court has noted that "the motivation aspect of Sec. 1985(3) focuses not on scienter in relation to the deprivation of rights but on invidiously discriminatory animus." Griffin v. Breckenridge, 403 U.S. 88, 102 n. 10, 91 S.Ct. 1790, 1798 n. 10, 29 L.Ed.2d 338 (1971). Although animus was distinguished from "specific intent," id., it certainly requires more than disparate impact
 Since reading statutes and legislative history requires a consideration of the plain meaning of words, we believe that animus best refers to "intention" or "purpose." See American Heritage Dictionary (2nd ed. 1982). This reading of animus would better fit with the Court's interpretation of the legislative history of Sec. 1985(3):
 [T]he sweep of Sec. 1985 as originally introduced in the House provoked strong opposition in that chamber and precipitated the proposal and adoption of a narrowing amendment, which limited the breadth of the bill so that the bill did not provide a federal remedy for "all tortious, conspiratorial interferences with the rights of others."
 See United Brotherhood of Carpenters, Local 610, 463 U.S. at 834, 103 S.Ct. at 3359.
 
 
 [6]
 William Conlee notes that he appeared at the clinic on March 25th under a parade permit obtained in the name of "Friends for Life." This is the only indication in the record of local government's involvement in regulating free speech
 
 
 [7]
 Section 1986 begins: "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title...." 42 U.S.C. Sec. 1986 (1988) (emphasis added)
 
 
 [8]
 MWMC argues that this Court should issue a preliminary injunction and prevent the protestors from picketing within 500 feet of the clinic. It argues that this would be a valid time, place and manner restriction under the Circuit's decision in Dallas Association etc. v. Dallas City Hospital District, 670 F.2d 629 (5th Cir.1982). Dallas Ass'n actually held that, although a state hospital was a public forum whose use could be limited by reasonable restrictions, the time, place and manner restrictions were too restrictive in regulating content and thus unconstitutional
 
 
 [9]
 The good Professor Bloom makes the point well:
 In a free society where people are free--responsible--who can consistently not be "pro-choice"? However, when the word still had some shape and consistency, a difficult choice meant to accept difficult consequences in the form of suffering, disapproval of others, ostracism, punishment and guilt. Without this, choice was believed to have no significance ... Now, when we speak of the right to choice, we mean that there are no necessary consequences, that disapproval is only prejudice and guilt only a neurosis ... America has no-fault automobile accidents, no-fault divorces, and it is moving ... toward no-fault choices.
 A. Bloom, The Closing of the American Mind 228 (1987).
 
 
 [1]
 489 F.2d 567, 572 (5th Cir.1974)
 
 
 [2]
 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)
 
 
 [3]
 811 F.2d 931 (5th Cir.1987)
 
 
 [4]
 Compare Portland Feminist Women's Health Center v. Buhler, 859 F.2d 681 (9th Cir.1988)