DALLAS ASSOCIATION OF COMMUNI-
TY ORGANIZATIONS FOR REFORM
NOW, et al., Plaintiffs-Appellants,

v.

DALLAS COUNTY HOSPITAL DIS-
TRICT, Defendant-Appellee.

No. 79–3967.

United States Court of Appeals,
Fifth Circuit.

Unit A

Sept. 25, 1981.

Roger E. Albright, Dallas Legal Services Fdn., Inc., Dallas, Tex., for plaintiffs-appellants.

Mary F. Keller, American Civil Liberties Foundation of Texas, Inc., Austin, Tex., for Texas Civil Liberties Union.

Robert L. Schwartz, Chicago, Ill., for American Hospital Assoc.

Earl Luna, Thomas V. Murto, III, Dallas, Tex., for defendant-appellee.

Before BROWN, COLEMAN and GEE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This appeal presents a constitutional issue that is not clearly controlled by prior authority. Plaintiffs, the Dallas Association of Community Organizations for Reform Now (ACORN), Scott Holladay, the past regional organizer for ACORN, and Leon Gowans, chairman of a neighborhood group affiliated with ACORN,[1] appeal the District Court's, 478 F.Supp. 1250, judgment denying them injunctive and declaratory relief and attorneys' fees, and awarding court costs to the defendant, Dallas County Hospital District (District), in an action brought pursuant to 42 U.S.C. § 1983, *et seq.*, as well as the First and Fourteenth Amendments.[2] ACORN contends that the District Court erred in concluding (i) that a hospital owned and operated by the District, a governmental subdivision, is not a "public forum" suitable for First Amendment leafletting, and (ii) that the hospital's "no solicitation rule" comports with freedom of speech guarantees of the Constitution. Concluding that the conditions at the hospital warrant the implementation of time, place, and manner

---

1. Unless necessity dictates otherwise, plaintiffs will be referred to collectively throughout this opinion as ACORN.

2. Jurisdiction is conferred by 28 U.S.C. § 1343(3).

restrictions on First Amendment activity in even the nonpatient care areas, we affirm, and do not reach the constitutionality of the "no solicitation rule".

I.

The District is a political subdivision created and operated under Tex.Rev.Civ.Stat. Ann. art. 4494n (Vernon) to provide medical and hospital care to both indigent and paying patients of Dallas County, Texas. Approximately one-half of its operating revenues derives from ad valorem taxes levied in Dallas County. Its Board of Managers, which is appointed by the Dallas County Commissioner's Court, appoints an Administrator and governs the District.

One of the major hospitals providing health care to the indigent in Dallas is Parkland Memorial Hospital, owned and operated by the District. Parkland has facilities for emergency care, inpatient hospital care, and outpatient care. It is also a teaching hospital. Many services are available at Parkland that are not available in other hospitals, such as a nationally known burn center. Consequently, in addition to the indigent of Dallas County, Parkland attracts and serves many patients who can pay a portion or all of the costs of the medical and hospital services received by personal payment, insurance, Medicare, Medicaid, or other means.

Parkland hospital complex has three entrances for patients—the front lobby entrance for most patients being admitted to the hospital, the outpatient clinic entrance to the side, and an emergency room entrance in the rear. It is surrounded by busy public streets. Vehicular access is limited to three entrances. There is a patient parking lot on the grounds of the hospital and a public lot across the street. Those patients who do not arrive by private automobile or taxi generally come by bus. Three bus stops are located on city property adjacent to the hospital.

The outpatient clinic is a five story annex to the main part of the hospital. Of the five stories, the ground floor or basement is subterranean while floors one through four are above the earth's surface. It has two entrances on the first floor, one from the front lobby and one from the outside. A small lobby, containing an information desk on one side and cashier and prescription distribution centers on the other, constitutes the heart of the clinic's first floor. Branching off the lobby are halls leading to (i) the triage clinic, which diagnoses walk-in patients and directs them to appropriate areas of the hospital, (ii) the pharmacy, which has a large and crowded waiting room, (iii) the administrative offices of the clinic, and (iv) other portions of the hospital. The ground floor comprises numerous examination rooms, a couple of small waiting areas, and connecting hallways. Larger central waiting rooms surrounded by examination and treatment rooms are found on the second, third, and fourth floors.

When completed in 1958, the outpatient clinic was designed to treat approximately 400 ambulatory patients a day. Since that date, the number of patients has increased on an average of ten percent each year. In 1978, the clinic averaged 906 patients a day. A study that same year projected future demand for the clinic, recommending that a new ten story building be constructed to replace the current structure.

Because of lack of space and the excessive number of patients requiring care in the outpatient clinic on a daily basis, hospital personnel were, in 1977, instructed to refrain from using the outpatient clinic as a means of ingress to or egress from the hospital complex and have been required to utilize waiting rooms for activities related to patient care. For example, the second, third, and fourth floor waiting rooms routinely provide needed space for teaching patients such as those with diabetic or cardiac ailments, counseling families, recording patient histories, taking patient's vital signs, as well as administering oral and intravenous medications. While none of these activities take place in the waiting rooms located in the first floor lobby area of the outpatient clinic, blood is drawn in the phlebotomy room adjacent to the triage clinic on the first floor to which the public has direct access.

ACORN is an organization of low to moderate income families which operates

through neighborhood groups to promote social and economic changes. Families may become members of ACORN by paying dues which, as far as they go, are used to pay the salaries of ACORN staff personnel and other expenses.

In the fall of 1978, one of the issues in which ACORN members were interested was the improvement of health care provided to low and moderate income residents of Dallas County. During this time ACORN members were attending meetings of the Board of Managers of the District and speaking to the press regarding their grievances.

On Saturday, September 2, 1978, approximately forty-five ACORN members convened in the front lobby at the main entrance to the hospital to read a statement criticizing conditions at Parkland. No prior approval had been obtained from the hospital administrator. The demonstration was covered by two television stations. Because a crowd gathered blocking the flow of traffic across the lobby to the clinics on the first floor, an administrator asked the ACORN members to leave. In doing so, the administrator relied on a "no solicitation rule" adopted by the Board of Managers of the District in 1967, which provides: "For the protection of our employees and patients, solicitation of any kind on hospital premises is prohibited without prior written approval of the Hospital Administrator."

Ten days later, six to eight ACORN members entered the first floor of the outpatient clinic without permission and attempted to distribute two different leaflets to people in waiting rooms throughout the clinic. The leaflets identified as defective health care conditions a need for (i) neighborhood clinics, which ACORN believed the Board of Managers of the District opposed,

(ii) improved waiting room conditions, (iii) reduced waiting time at Parkland, (iv) Spanish-speaking employees in the clinic, and (v) additional parking for patients and their families.[3]

Once again an administrator asked the ACORN members to leave. Before leaving, one member of the group berated a secretary in a belligerent fashion and shook his finger in the face of the assistant director of the clinic, threatening to sue her.

Following these expulsions of its members, ACORN brought this suit seeking declaratory and injunctive relief from the enforcement of Parkland's "no solicitation rule." After a bench trial, the District Court held that although ACORN's leafletting at Parkland is the kind of activity protected by the First Amendment, a public hospital is not a public forum. The court reasoned that the hospital in its entirety must be considered as an institution whose purpose and primary normal activity is health care. Consequently, the court concluded, no part of Parkland is a public forum. Nor could the court find the "no solicitation rule," applied non-discriminately, was unconstitutional. Simply because Parkland might be the best forum for addressing a given audience, the court concluded, does not mean that it is a constitutionally protected forum. Comparing the patients at Parkland to a "captive audience," the court reasoned they would only escape ACORN's intrusions by leaving and possibly injuring their health. In reaching these conclusions, the court emphasized that its decision did not purport to deny to ACORN access to the public streets, public parking lots, or bus stops in the vicinity of the Parkland complex. *See Iskcon v. Schrader*, 461 F.Supp. 714 at 718 (N.D.Tex. 1978).

---

3. One of the leaflets, which was less controversial than the other, was two typed pages. This leaflet promoted neighborhood health clinics, criticized the Board's opposition to these clinics, and listed some of the other concerns of ACORN about Parkland. Most of the testimony at trial related to the possible detrimental effects on patients of the second leaflet. At the top of this one page leaflet is a large bold faced caption saying, "How long have you been wait-

ing for decent health care?" Under the caption is a cartoon depicting the patient waiting area. The doctor at the door is shouting, "Next!" to the only occupant of the waiting room—a skeleton draped in a chair with cobwebs over its head. Under this graphic cartoon is a short demand for neighborhood health clinics, a notice of an ACORN meeting at Parkland, and a list of some other health care issues.

## II.

The District Court's ruling that Parkland Hospital is not a "public forum" for First Amendment purposes decides an issue of first impression in this Circuit. In reaching its conclusion, the court found, applying the "historical test" of *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1975) as the exclusive measure of what is a public forum, that "[t]here is not evidence in the record, and the court can conceive of none, to show that a hospital has historically been a forum for any kind of protected speech." Then utilizing the "realistic test" of *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), the court examined the present activity in the forum before determining that "[t]here is a 'basic incompatibility' between leafletting in the public areas of a hospital and the rendition of health care." The court explained that this incompatibility arises from both the *type* of activity, physical distribution of leaflets in already overcrowded waiting areas, and the possible detrimental effects on patients from the *content* of the leaflets.

ACORN attacks these conclusions, advancing four theories why the District Court's ruling is incorrect. First, ACORN argues that the court impermissibly considered the content of the leaflets in resolving the public forum question. Although conceding that the time, place, and manner of leafletting can be regulated, ACORN asserts that content cannot be regulated. To support this argument, ACORN emphasizes that other forms of public expression and solicitation, many critical of Parkland, are allowed in the public areas of the outpatient clinic without restriction on their manner or content.[4] On the contrary, ACORN stresses that the hospital administration admitted having no knowledge of what the literature in the waiting rooms contained or who placed it there.

Even if the leaflets' contents could permissibly be considered, ACORN asserts that there is no necessary incompatibility between the leafletting and the rendering of health care. ACORN points to the fact that the waiting areas where it desires to distribute leaflets are open to the public, service only ambulatory patients, are entirely separate from the inpatient portion of the hospital, and thus are similar to waiting areas located in similar governmental institutions which have been held to be proper forums for First Amendment activities. *See Albany Welfare Rights Organization v. Wyman*, 493 F.2d 1319 (2d Cir. 1974). Moreover, ACORN claims the fact that Parkland allows the holding of other activities, such as Board of Managers' meetings in which issues and controversies negatively reflecting on the operation of the hospital, provides evidence that the public areas of the outpatient clinic are appropriate for, and presently used as, a public forum for the peaceful, non-disruptive exchange of information.

Third, ACORN argues that Parkland provides the best reasonable forum to reach the relevant audience, i. e., the indigent patients, and that no suitable alternative exists. Although the vast majority of Parkland's patients live in identifiable sections of Dallas County, ACORN asserts it does not have the resources to canvass these patients.[5] Nor are the public streets and sidewalks around Parkland viable alternatives, ACORN argues, because it needs access to the object of the protest (the hospital) simultaneous with access to the audience (the patients), and the streets may be subject to time, place, and manner regulations necessary to further significant government interests.

---

4. As examples, ACORN pointed out that newspapers, magazines, pamphlets, periodicals, military and advertising bulletins, in addition to other types of literature, are displayed in racks in the clinic waiting rooms, as well as notices on bulletin boards, posters, and other displays.

5. ACORN argues that over two-thirds of the outpatients are scattered among Dallas County's million-plus population. In order to reach the remaining 28.64% living in three identifiable zip code zones, ACORN, basing its statistics on 1970 census figures, claims it would be forced to canvass an area of approximately 20,678 acres in search of 66,019 patients out of a total 150,287.

As a final theory why Parkland should be regarded a "public forum," ACORN contends the Parkland patients cannot be characterized as a "captive audience." ACORN points out that no showing was made that the substantial privacy rights of persons seated in the hospital waiting areas, or walking along the sidewalks leading to the parking lots and bus stops, were being invaded in an intolerable manner. Nor was it established, ACORN submits, that any patient left the hospital because of the leafletting.

The District denies all these assertions, arguing that the District Court, in making its decision, was entitled to consider the leaflets' contents because they contained matter adverse to the hospital's mission. Primarily, however, the District concentrates on the propriety of the court's applying a "historic test" and in concluding that Parkland is not a "public forum."

The concept of a "public forum" for First Amendment purposes was originally formulated by Justice Douglas, dissenting in *Adderly v. Florida,* 385 U.S. 39, 53–55, 87 S.Ct. 242, 250–252, 17 L.Ed.2d 149, 159–61 (1966). Since that opinion, the courts of this nation have determined that streets, sidewalks, and parks,[6] schools,[7] public transportation facilities,[8] welfare office waiting rooms,[9] and state capitol grounds[10] are "public forums" for First Amendment activities. On the other hand, jails,[11] military bases,[12] and city buses,[13] although government institutions doing the people's business, are not performing speech-related functions,[14] and are subject to reasonable time, place, and manner regulations. *See, e. g., United States Postal Service v. Council of Greenburgh Civic Associations,* —— U.S. ——, ——, 101 S.Ct. 2676, 2684–85, 69 L.Ed.2d 517 (1981); *Consolidated Edison Co. v. Public Service Commission,* 447 U.S. 530, 537–39, 100 S.Ct. 2326, 2333–34, 65 L.Ed.2d 319, 327–29 (1980); *Linmark Associates, Inc. v. Willingboro,* 431 U.S. 85, 93, 97 S.Ct. 1614, 1618, 52 L.Ed.2d 155 (1977); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346, 363–64 (1976), *Grayned v. Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).

Without addressing the parties' specific contentions regarding the propriety of the District Court's application of the "historical test" or the "realistic test," or both, in determining whether Parkland is a "public forum," we conclude the judgment must be affirmed. There can be little question that a public hospital is, for First Amendment purposes, very different from municipal streets and parks which have traditionally served and previously been characterized as forums for free public assembly and com-

---

**6.** *Flower v. United States,* 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972); *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

**7.** *Tinker v. Des Moines Ind. Comm. School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *cf. Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (reasonableness of an antinoise ordinance regulation as applied to picketing outside a school).

**8.** *Wolin v. Port of N.Y. Auth.,* 392 F.2d 83 (2d Cir.), *cert. denied,* 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968) (bus station); *Chicago Area Military Project v. Chicago,* 508 F.2d 921 (7th Cir.), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975) (airport).

**9.** Both *Albany Welfare Rights Org. v. Wyman,* 493 F.2d 1319 (2d Cir.), *cert. denied,* 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974), and

*Unemployed Workers Union v. Hackett,* 332 F.Supp. 1372 (D.R.I.1971), struck down no solicitation rules which prohibited leafletting in welfare waiting rooms.

**10.** *Edwards v. South Carolina,* 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

**11.** *Adderly v. Fla.,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966).

**12.** *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1975).

**13.** *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974).

**14.** *See L. Tribe, American Constitutional Law* § 12–21, at 691 (1978).

munication of thoughts by private citizens. *See* text above and note 6, *supra.*

The Supreme Court has suggested that while performing public functions public hospitals are akin to jails and may impose reasonable time, place, and manner restrictions on First Amendment activities. *See Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 512 n.6, 89 S.Ct. 733, 739 n.6, 21 L.Ed.2d 731, 741 n.6 (1969). Moreover, in *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), the Supreme Court stated the Constitution does not require that display cases in public hospitals become public forums open to every would-be pamphleteer and politician. *Id.* at 304, 94 S.Ct. at 2718, 41 L.Ed.2d at 778. Following these intimations, other courts also have concluded that even peaceful speech and assembly interfering in any way with the functioning of a hospital may be excluded. *See, e. g., United States v. Douglass,* 579 F.2d 545, 549 (9th Cir. 1978); *Chicago Area Military Project v. City of Chicago,* 508 F.2d 921, 925 (7th Cir. 1975); *International Society for Krishna Consciousness v. Schrader,* 461 F.Supp. 714, 718 (N.D.Tex.1978).

Despite the Supreme Court's recent rulings in *NLRB v. Baptist Hospital, Inc.,* 442 U.S. 773, 99 S.Ct. 2598, 61 L.Ed.2d 251 (1979), and *Beth Israel Hospital v. NLRB,* 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978), permitting limited union solicitation in "non-patient care" areas of hospitals, we find those cases factually distinguishable from that before us. To say the least, Parkland hospital is overcrowded and congested. Over twice as many patients are seen in the outpatient clinic as it was designed to handle on a daily basis. Of the average, 900 patients are treated each day in the outpatient clinic and approximately five percent of these are admitted to the main hospital for inpatient care. Some of those checking in at the outpatient clinic require emergency care. Blood is drawn in areas of the first floor to which the public has direct access. Because of the high traffic flow through the outpatient clinic, employees were requested in 1977 not to use it as a means of ingress to or egress from the main hospital. When ACORN did conduct activities at Parkland, the lobby of the hospital became so congested that traffic to and from the outpatient clinic was blocked.

■ From our review, we conclude such was not the case in *Baptist Hospital or Beth Israel Hospital.* Consequently, we determine that the conditions at Parkland warrant the implementation of time, place, and manner restrictions on First Amendment activity in even the nonpatient care areas of the hospital and outpatient clinic areas which might in a different hospital not interfere with the functions of providing care to the sick and injured. Unlike the District Court, in reaching our conclusion we have not considered the content of the leaflets. *See Council of Greenburgh Civic Association,* 85, 69 L.Ed.2d at 517; *Consolidated Edison,* 447 U.S. at 537, 100 S.Ct. at 2333, 65 L.Ed.2d at 327. Rather, we emphasize that our decision is based on the necessity to ensure that the extreme congested conditions at Parkland are not further aggravated. We merely wish to enable those who need health care at Parkland to receive it without interference and without the grave possibilities of adverse medical reactions from such disturbing conditions.

■ Moreover, despite ACORN's arguments, we do not find that it has shown a lack of suitable alternative forums for conducting its solicitations. We agree with the District Court that "just because Parkland Hospital may be the best forum does not mean it is a constitutionally protected forum." The complex is surrounded by public streets and public parking lots. Advertisements may be run in local newspapers and on area television or radio stations. Neighborhoods may be canvassed by pamphleteers. In light of the congested conditions at Parkland, we do not find it unreasonable to expect ACORN to utilize one of these alternative forums.

### III.

ACORN also claims that the District Court incorrectly concluded that Parkland's "no solicitation rule," applied nondiscriminately, does not violate the First Amendment. Specifically, ACORN claims that the

"rule" must be struck down because it is both "vague" and "overbroad."

Having determined that Parkland may constitutionally limit the activities of ACORN in the front lobby of Parkland and its various outpatient waiting rooms, we need not reach the constitutionality of the "no solicitation rule." Our ruling that Parkland was justified in restricting ACORN's activities in certain sensitive areas of the hospital transcends the "no solicitation rule," thus we need not determine the constitutionality of that rule.[15] The rule, which plainly prohibited solicitation on any part of the hospital's premises without the permission of the Hospital Administrator, need not be tested for constitutional deficiencies under the present facts. Our holding is limited to an approval of Parkland's policy with regard to these plaintiffs, and it would be purely academic for us now to inquire into the application of the "no solicitation rule" to other types of plaintiffs and other areas of the hospital's premises.

In light of our limited holding, that it was necessary neither for the District Court nor for this Court to reach the constitutionality of the "no solicitation rule," we emphasize that Parkland is not forbidden to enact a new "no solicitation rule" that explicitly sets forth the activities to be restricted, standards for those who apply them, and a detailed definition of its terms. Under the present facts in controversy, however, it is unnecessary to remand that issue to the District Court. For the reasons discussed earlier in this opinion, the judgment of the District Court is affirmed.

AFFIRMED.

---

**15.** This Court observes, in passing, that the "no solicitation rule" is quite clear in its prohibition of all solicitation without prior written approval, thus the rule does not appear "vague". As to the overbreadth of the rule, we defer to the U.S. Supreme Court's recent holding in *Heffron* *v. International Society for Krishna Consciousness, Inc.,* —— U.S. ——, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), wherein a rule requiring solicitors within Minnesota's fair grounds during the state fair to do so only from a fixed location was found to be constitutional.