[Civ. No. 54007. First Dist., Div. Two. Sept. 17, 1982.]

PRISONERS UNION et al., Plaintiffs and Appellants, v. DEPARTMENT OF CORRECTIONS et al., Defendants and Respondents.

COUNSEL

Michael R. Snedeker and Smith & Snedeker for Plaintiffs and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Karl S. Mayer and Thomas P. Dove, Deputy Attorneys General, for Defendants and Respondents.

OPINION

**GRODIN, P. J.**—Appellant Prisoners Union is a nonprofit organization concerned with the welfare of prisoners and their families. By this action for declaratory and injunctive relief, it and certain of its members challenge the power of state prison officials to ban it from distributing informational literature to visitors of inmates in a public parking lot located on prison property but outside prison walls. We hold that such activity is protected by the federal and state Constitutions, and that it cannot be banned absent a showing that such activity would pose an overriding threat to prison security, or to another similar state interest. Since we find no such showing on this record, we conclude that appellants are entitled to the relief which they seek.

The prison at issue is the Correctional Training Facility known as Soledad, located two miles north of the town of Soledad in Monterey County. Two of the three facilities at Soledad, North and Central, share a common parking lot outside the entrance building to the prison. The lot is open to members of the general public wishing to visit a prisoner or to purchase crafts in the prison hobby shop located in the entrance building. No security check or clearance is required as it is for entry into the prison itself. On weekends, it is common for several hundred persons to come to the entrance building, via cars or buses, to visit prisoners. The only prisoners allowed in the parking lot are those classified as "minimum B custody" (i.e., prisoners with low assaultive tendencies who are shortly due to be released) who are assigned to maintain the area. Organizations representing employees of the prison are permitted to use the parking lot as a forum for communicating with those employees.

In March 1980, several members of the Prisoners Union attempted to distribute literature within the entrance building to the prison, but they

were told to leave, and were escorted off prison-owned property. They recommenced their activity at the gate to the prison property, just off the county frontage road, but sheriff's deputies instructed them to leave because stopping cars created a traffic hazard.

In April 1980, the Prisoners Union wrote the Soledad prison superintendent, requesting permission to set up a card table in the corner of the visitors parking lot to give information and literature to the visitors of the prisoners as they are leaving the institution. The letter stated that the union wished to keep families of prisoners informed of numerous bills being considered in the Legislature, and that there was no other way of doing it. It offered to inform prison authorities in advance of any such activity, to provide identifications of persons who would come on the grounds, to limit the number of persons who would come, and to stay within a designated area.

The superintendent at Soledad denied the union's request without explanation, and the union then referred it to the Director of Corrections. She responded that it was the policy of the department that, except for recognized employee organizations, private organizations were not permitted "to enter institution grounds to further their aims." Appellants then instituted this action for declaratory and injunctive relief.

At the hearing on the order to show cause, Dennis Martell, program administrator at Soledad, was asked to explain the reason for the ban on informational activity by nonemployee organizations. He stated: "The administration at Soledad believes it's counterproductive and it threatens the safety and security of the institution ... there are a number of issues that are raised or provided to the visitors coming into the institution that we feel either excites or agitates or develops some unrest among the inmates that could have some detrimental effects." He also stated that the department is concerned with such activity "being a front for organizing within the institution by the Prisoners' Union." Finally, he testified that the parking lot is a busy, congested area with minimal security, in which contraband such as weapons and narcotics are found, and that if tower guards were to survey activities in the parking lot they would have to take their attention away from other areas, such as the fence around the prison.

The trial court found the evidence insufficient to establish any prior breach of prison security by members of the Prisoners Union or their agents, but it also found that "to allow members of the public, whether it be the Prisoners' Union or any other group, to distribute literature as requested by the Prisoners' Union herein, would create a 'public forum'

on prison grounds and substantially increase security problems at the prison," and that "[o]ther reasonable means of distribution are available including off-grounds distribution, direct distribution to inmates, and distribution to inmate families by mail or otherwise." Based on these findings, and what it considered to be applicable legal principles, the trial court denied the requested preliminary injunction. Upon request by appellants, the trial court entered judgment denying a permanent injunction and declaratory relief, and it is from that judgment that this appeal is pursued.

*Discussion*

I.

■ The peaceful pamphleteering appellants propose to engage in is a form of expression protected by the First Amendment to the United States Constitution (*Organization for a Better Austin* v. *Keefe* (1971) 402 U.S. 415, 419 [29 L.Ed.2d 1, 5, 91 S.Ct. 1575]; *Lovell* v. *Griffin* (1938) 303 U.S. 444, 452 [82 L.Ed. 949, 954, 58 S.Ct. 666]), and by article I, sections 2 and 3 of the California Constitution (see *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341], affd. (1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035]; In re *Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353]). Thus, so long as it does not incite to unlawful acts, it is not subject to regulation based upon its content. (*Brandenburg* v. *Ohio* (1969) 395 U.S. 444 [23 L.Ed.2d 430, 89 S.Ct. 1827].) It is, however, subject to reasonable regulation as to time, place, and manner (e.g., *Cox* v. *New Hampshire* (1941) 312 U.S. 569, 575-576 [85 L.Ed. 1049, 1053, 61 S.Ct. 762, 133 A.L.R. 1396]).

Respondents contend that the prohibition against use of the prison parking lot is ipso facto a reasonable regulation as to place because such an area is not and cannot be made to be a "public forum" for the purpose of communication. Indeed, they suggest that analysis need proceed no further than that simple proposition. The trial court's findings reflect, at least in part, a similar view of the matter.

It appears from our analysis of the cases, however, that the principles governing the right to free expression in public places, including grounds of a prison to which the public has access, cannot be contained within such a rigid formulation. The term "public forum," which originated in a dissenting opinion by Justice Douglas in *Adderley* v. *Florida* (1966) 385 U.S. 39 [17 L.Ed.2d 149, 87 S.Ct. 242], refers typically to those places historically associated with First Amendment activities,

such as streets, sidewalks, and parks. (See, e.g., *Hague* v. *C.I.O.* (1939) 307 U.S. 496 [83 L.Ed. 1423, 59 S.Ct. 954].) A leading constitutional scholar has characterized that term as "constitutional shorthand for the proposition that ... government cannot regulate speech-related conduct in such places except in narrow ways shown to be necessary to serve significant governmental interests ... even if the regulation challenged as invalid leaves would-be speakers or paraders with ample alternatives for communicating their views." (Tribe, American Constitutional Law (1978) at p. 689.)

These are not the only areas where speech has received constitutional protection, however. Rather, as the Court of Appeals for the Ninth Circuit has observed: "A hierarchy of forums emerges from the cases. At one extreme—and most protected from any form of regulation—are areas such as public streets ... and parks, traditionally recognized as centers for the public communication of ideas. Less protected are facilities such as libraries and schools, where the government has the power to limit speech to maintain the order required to carry on the purpose of those institutions. Least shielded from regulation are public institutions which do not perform speech-related functions at all—such as hospitals, jails or military bases. Here the government is free to exclude even peaceful speech and assembly which interferes in any way with the functioning of those organizations. *The basic thrust of these cases is to limit regulation to that which proscribes expression that is 'basically incompatible with the normal activity of a particular place at a particular time.'*" (*United States* v. *Douglass* (9th Cir. 1978) 579 F.2d 545, 548-549, italics added.) The court's quotation is from *Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 116 [33 L.Ed.2d 222, 232, 92 S.Ct. 2294].

The Court of Appeals for the Third Circuit recently relied upon *Grayned* for a similar analysis: "[W]hen the state restricts speech in some way, the court must look to the special interests of the government in regulating speech in the particular location. [Citation.] The focus of the court's inquiry must be whether there is a *basic incompatibility* between the communication and the primary activity of an area. [Citation.]" (*American Future Systems* v. *Pa. State University* (3d Cir. 1980) 618 F.2d 252, 256, italics added.) Thus, the court held, a determination that university residence halls did not constitute a public forum "does not end our inquiry .... There are some 'non-public forum' areas where the communication does not significantly impinge upon the primary business carried on there. [Citation.]" (*Ibid.*; see also, *Fernandes* v. *Limmer* (5th Cir. 1981) 663 F.2d 619, 626, 627 [holding that certain parts of the interior of airports are "at least partly" public

forums, available for the distribution of literature]; *Grace* v. *Burger* (D.C. Cir. 1981) 665 F.2d 1193, 1202, cert. granted (1982) 457 U.S. 1131 [73 L.Ed.2d 1347, 102 S.Ct. 2955] [holding that restriction must be justified by a "significant governmental interest"]; *Dallas Ass'n etc.* v. *Dallas Cty. Hospital Dist.* (5th Cir. 1981) 656 F.2d 1175, mod. (5th Cir. 1982) 670 F.2d 629 [rejecting more restrictive formulations by the district court and a panel of the Fifth Circuit, and adopting, en banc, the *Grayned* analysis].)

When the government institution at issue is not engaged in speech-related functions and there is a showing that speech or assembly would interfere with the functions that are performed there, it is necessary to consider whether alternative channels for communication exist (*Tribe, supra*, at pp. 690-691). Relevant to that consideration is the relationship between the speech and the premises, as where "the place represents the object of protest, the seat of authority against which the protest is directed . . . [or] where the relevant audience may be found." (*Wolin* v. *Port of New York Authority* (2d Cir. 1968) 392 F.2d 83, 90, cert. den., 393 U.S. 940 [21 L.Ed.2d 275, 89 S.Ct. 290].) Thus, communication to a "special audience" of servicemen traveling to and from their bases may be particularly appropriate at waiting rooms of a bus terminal. (*Id.*, at pp. 90-91; see also *Albany Welfare Rights Organization* v. *Wyman* (2d Cir. 1974) 493 F.2d 1319, 1323, cert. den., 419 U.S. 838 [42 L.Ed.2d 64, 95 S.Ct. 66] [urging welfare reform in the lobby of a welfare office].) Where the relevant audience is found only in a particular place, it has been suggested that "[t]he bare possibility of alternative ways to communicate the same message should not suffice to defeat the first amendment claim." (Tribe, American Constitutional Law, *supra*, at p. 692.) Finally, even where alternative methods of communication are found to exist, and the regulation is neutral as to content, "the question becomes one of balancing, based on the nature of the forum, the governmental interest in enforcing the restrictions against the inhibitions the restrictions impose on the speech-related activity." (*Concerned Jewish Youth* v. *McGuire* (2d Cir. 1980) 621 F.2d 471, 473-474, cert. den. (1981) 450 U.S. 913 [67 L.Ed.2d 337, 101 S.Ct. 1352].)

*Jones* v. *North Carolina Prisoners' Union* (1977) 433 U.S. 119 [53 L.Ed.2d 629, 97 S.Ct. 2532], upon which respondents principally rely, is not inconsistent with these principles. That case upheld certain limitations by state prison officials upon activities—the holding of meetings of a prisoners' union, solicitation of inmates to join the union, and attempts to utilize prison facilities for the distribution of union publications that had been mailed to several inmates in bulk—against

attack under the First Amendment and the equal protection clause of the Fourteenth Amendment. There was evidence, in the form of predictions by prison officials, that such activities would cause serious disruption within the prison, including violence. The court observed that "[i]n a prison context, an inmate does not retain those First Amendment rights that are 'inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system' [citation]" (433 U.S. at p. 129 [53 L.Ed.2d at p. 641]), and considered that such rights were "barely implicated" by the restrictions imposed (433 U.S. at p. 130 [53 L.Ed.2d at p. 641]). Based upon the views expressed by prison officials, the court found that the prison's regulations were drafted "no more broadly than they need be to meet the perceived threat .... When weighed against the First Amendment rights asserted, these institutional reasons are sufficiently weighty to prevail." (433 U.S. at p. 133 [53 L.Ed.2d at p. 643].)

The union's equal protection claim was based upon evidence that other organizations, such as Alcoholics Anonymous and the Jaycees, were permitted to engage in activities within the prison.[1] In rejecting that claim, the Supreme Court criticized the district court for treating the case "as if the prison environment were essentially a 'public forum.'" (433 U.S. at p. 134 [53 L.Ed.2d at p. 644]). Noting its decision of the prior term upholding a ban on public meetings at a military base (*Greer* v. *Spock* (1976) 424 U.S. 828 [47 L.Ed.2d 505, 96 S.Ct. 1211]), the court stated: "A prison may be no more easily converted into a public forum than a military base. Thus appellants need only demonstrate a rational basis for their distinctions between organizational groups." (433 U.S. at p. 134 [53 L.Ed.2d at p. 644].) Such a basis for distinction existed in the opinions of prison authorities that the prisoners' union, whose purposes were illegal under state law, posed a unique threat to prison security. "Since a prison is most emphatically not a 'public forum,' these reasonable beliefs of appellants are sufficient [citations]. The District Court's further requirement of a demonstrable showing that the Union was in fact harmful is inconsistent with the deference federal courts should pay to the informed discretion of prison officials. [Citation.] It is precisely in matters such as this, the decision as to which of many groups should be allowed to operate within the prison walls, where, confronted with claims based on the Equal Protection Clause, the courts should allow the prison administrators the full latitude of discretion, unless it can be firmly stated that the two groups are so similar that discretion has been abused." (*Id.*, at p. 136 [53 L.Ed.2d at p. 645].)

---

[1] Though employee organizations are excused from the policy under review, appellants assert no equal protection claim.

The court in *Jones* was careful to limit its opinion to communications among inmates "within the prison walls." (433 U.S. at p. 136 [53 L.Ed.2d at p. 645].) It observed that prison authorities had "disavowed any intention of interfering with correspondence between outsiders and individual inmates in which Union matters are discussed," and it expressly declined "to discuss questions of the First Amendment right of inmates, or outsiders, [citation], in the context of a total prohibition on the communication of information about the Union." (433 U.S. at p. 131, fn. 8 [53 L.Ed.2d at p. 642].) Moreover, it made clear that the "informed discretion of prison officials that there is potential danger may be sufficient for limiting rights *even though this showing might be 'unimpressive if ... submitted as justification for governmental restriction of personal communication among members of the general public.'* [Citation.]" (433 U.S. at p. 133, fn. 9 [53 L.Ed.2d at p. 643], italics added.)

Thus, *Jones* does not constitute authority for a categorical ban on communication among free citizens in a public parking lot, simply because the parking lot is located on prison property.[2] The question is not merely whether the parking lot is or is not a "public forum." Rather, the question is "one of balancing, based on the nature of the forum, the governmental interest in enforcing the restrictions against the inhibitions the restrictions impose on the speech-related activity." (*Concerned Jewish Youth* v. *McGuire, supra,* 621 F.2d 471, 473-474.) In asserting that balance, the fact that a prison is involved is highly relevant, but not determinative. Ultimately, the answer depends upon whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time. (*Grayned* v. *City of Rockford, supra,* 408 U.S. 104, 116 [33 L.Ed.2d 222, 232].)

California authorities uphold the right of expression in public places on the basis of principles which are at least as protective of speech as those we have considered, and in some respects more protective. To the extent that greater protection is afforded by California authorities, it is justified by article I, section 5 of the California Constitution, "[a] protective provision more definitive and inclusive than the First Amendment." (*Robins* v. *Pruneyard Shopping Center, supra,* 23 Cal.3d 899, 908, affd. 447 U.S. 74.)

---

[2] Nor is *Adderley* v. *Florida, supra,* 385 U.S. 39, upon which respondents also rely, authority for such a proposition. That case involved the propriety of an injunction against approximately 200 demonstrators who physically blocked a vehicular passage over a jail driveway used for transportation of prisoners and deliveries, and not by the public generally. It is significant that *Adderley* is not cited in *Jones.*

In *In re Hoffman, supra*, 67 Cal.2d 845, the California Supreme Court upheld the right of Vietnam war protestors to distribute antiwar literature at a privately owned railway station. The court observed: "The primary uses of municipal property can be amply protected by ordinances that prohibit activities that interfere with those uses. Similarly, the primary uses of railway stations can be amply protected by ordinances prohibiting activities that interfere with those uses. *In neither case can First Amendment activities be prohibited solely because the property involved is not maintained primarily as a forum for such activities. . . . [T]he test is not whether petitioners' use of the station was a railway use but whether it interfered with that use.*" (*Id.*, at pp. 850-851, italics added.) Since there was no showing of interference, that court found it "immaterial that another forum, equally effective, may have been available to petitioners," so that there was "no need to balance, and we need not review those instances where the narrowness of the issue restricts the appropriate audience, creating a compelling need for a particular forum that may be upheld against a very slight competing interest. (Cf. *Schwartz-Torrance Inv. Corp.* v. *Bakery & Confectionary Workers' Union* (1964) 61 Cal.2d 766 [40 Cal.Rptr. 233, 394 P.2d 921].)" (*Id.*, at p. 852, fn. 7; see also *In re Lane* (1969) 71 Cal.2d 872, 878 [79 Cal.Rptr. 729, 457 P.2d 561].)[3]

## II.

In reviewing respondents' policy, the trial court appears to have accepted respondents' all-or-nothing approach: the prison parking lot cannot be termed a "public forum" because, if it were, there would be no way to protect the prison's security interests from the flood of potential users. This reasoning is reflected in the court's finding that "to allow members of the public, *whether it be the prisoners' union or any other group*, to distribute literature as requested by the Prisoners' Union herein, *would create a 'public forum'* on prison grounds and substantially increase security problems at the prison." As the court observed in its notice of intended decision, "one card table inevitably leads to another."

This approach is not in accord with the constitutional principles we have discussed. Leaving to one side the special interest the Prisoners Union has in utilizing this particular location as a forum, and accepting for purposes of analysis the somewhat dubious hypothesis that if the Prisoners' Union is allowed to distribute literature in this rather remote

---

[3]In *Robins* v. *Pruneyard Shopping Center, supra*, 23 Cal.3d 899, 909-910, the California Supreme Court reaffirmed both *Hoffman* and *Lane*, observing that their usefulness as California precedent is not diminished by the fact that the opinions cited federal law.

location all manner of organizations will seek similar privileges, it does not follow that such privileges must be granted without limitation. On the contrary, it is quite clear that prison authorities would be entitled to impose reasonable restrictions as to time, place, and manner of use; and these might well include a rationing of use on some content-neutral basis as required by security or other legitimate governmental interests. (See *Wirta* v. *Alameda-Contra Costa Transit Dist.* (1967) 68 Cal.2d 51 [64 Cal.Rptr. 430, 434 P.2d 982].) Indeed, the Prisoners Union anticipated such limitations in its permission request, and offered to abide by them.

Even as to communications among inmates *within* a prison, regulations must be drafted "no more broadly than they need be to meet the perceived threat." (*Jones* v. *North Carolina Prisoners' Union, supra,* 433 U.S. at p. 133 [53 L.Ed.2d at p. 643].) The trial court did not find that the prison's legitimate security interests would be threatened by appropriately limited use of the parking lot by the Prisoners Union or similar organizations; nor would the record support such a finding.

Only three proffered reasons for the policy at issue appear in the record. Two of these relate peculiarly to the Prisoners Union, and thus do not support the broad ban on distribution by all nonemployee organizations. These are (1) that visitors raise with inmates the issues discussed in appellants' leaflets, and this in turn may develop unrest within the prison; and (2) that the activities proposed may be a "front" for organizing within the prison. No evidence was offered in support of either conjecture, nor did prison authorities suggest any reason for distinguishing in these respects between the activities proposed by appellants and other activities which are permitted. Prison authorities permit direct communications between the Prisoners Union and inmates, both by correspondence and through individual visitation. (See *In re Price* (1979) 25 Cal.3d 448, 452, fn. 3 [158 Cal.Rptr. 873, 600 P.2d 1330].) It has been held that institutional security interests were not shown to justify a prohibition on the wearing of union buttons by prisoners, in the absence of evidence of actual disruption or specific reasons for predicting disruption (*In re Reynolds* (1979) 25 Cal.3d 131, 134 [157 Cal.Rptr. 892, 599 P.2d 86]), nor to justify a prohibition of correspondence between inmates and a paroled Prisoners Union official, notwithstanding assertions by prison authorities that such correspondence might create a particularized risk. (*In re Brandt* (1979) 25 Cal.3d 136, 139 [157 Cal.Rptr. 894, 599 P.2d 89]; cf. *In re Price, supra,* 25 Cal.3d 448, in which a narrowly divided court upheld a ban on Prisoners Union meetings *within* a prison.) The Prisoners Union in this case proposed to distribute literature only to visitors *leaving* the prison. If there is a risk

to prison security in such activity, arising out of the possibility that the visitors will talk to inmates about disruptive matters at some later date, and if that risk is different from and somehow greater than other permitted forms of communication, the record does not so reflect.

The remaining reason offered by respondents in support of the ban was that the parking lot is a congested area, in which contraband such as weapons and narcotics are found. Precisely how the limited activity proposed by appellants would add to problems of contraband was not indicated, nor was there any showing that problems of congestion were such as to pose risks to security or other institutional interests beyond adequate control through regulations as to time, place, and manner.[4]

Since there was no substantial evidence of interference, inquiry as to alternative means of communication was not required. (*In re Hoffman, supra,* 67 Cal.2d 845, 852, fn. 7.) It would appear, however, that the parking lot of a prison is, for purposes of the communications proposed, a peculiarly appropriate forum. The relevant audience is gathered there, or not at all. What the trial court meant by its findings that the Prisoners Union had available "off-grounds distribution" is not clear, but the record does establish unequivocally that when members of the union attempted to distribute literature at the gate to prison property, they were ordered by sheriff's deputies to leave because their activities created a traffic hazard. The trial court also found that the union could engage in "direct distribution to inmates," presumably on the assumption that the inmates would then transmit the literature to relatives and friends. That is, however, a poor substitute for direct communication with the intended audience. The alternative of communication by mail is obviously more costly than personal distribution, and assumes the availability of names and addresses, an assumption not supported by evidence in the record. In sum, the trial court's overall finding that "other reasonable means of distribution" were available to the union is dubious, at best.

---

[4]Respondents insist that the record reflects a broader concern for security on the part of prison authorities. They point to testimony by Mr. Martell that, "The administration at Soledad believes it's counterproductive and it threatens the safety and security of the institution," and to his characterization of the parking lot as "an area where we find contraband such as weapons, narcotics, anything that you can imagine, alcohol, *activities in the parking lot that threaten our safety and security.*" (Respondents' italics.)

Invocation of a general concern over unidentified threats to safety or security cannot substitute, however, for evidence that the activities of appellants would endanger the safety or security of the prison in some specific way. We are mindful of Mr. Martell's testimony (*ante,* p. 933) that activities in the parking lot cannot readily be supervised by tower guards; but there is no evidence linking that testimony to specific threats posed by the proposed activities.

We do not attempt here to decide what limitations might be placed upon the distribution of literature by the Prisoners Union or other organizations in the parking lot upon an adequate showing of governmental interest. We conclude only that neither the trial court's findings nor the record establish a state interest sufficient to justify the absolute prohibition of expression contained in respondents' policy.[5] This conclusion is supported by the federal authorities we have discussed. It is mandated as well by California constitutional free speech principles which are even "'more definitive and inclusive than the First Amendment.'" (*Robins* v. *Pruneyard Shopping Center, supra,* 23 Cal.3d 899, 908, 909; *In re Lane, supra,* 71 Cal.2d 872, 878; *In re Hoffman, supra,* 67 Cal.2d 845, 850-852.)

The judgment is reversed, and the matter remanded to the trial court with directions to enter an injunction in accordance with the views expressed in this opinion.

Miller, J., and Smith, J., concurred.

A petition for a rehearing was denied October 15, 1982, and the opinion was modified to read as printed above. Respondents' petition for a hearing by the Supreme Court was denied December 1, 1982. Newman, J., did not participate therein. Mosk, J., and Richardson, J., were of the opinion that the petition should be granted.

---

[5] In their petition for rehearing, respondents apparently concede that it is their burden to establish that the proposed activity would interfere in some way with the functioning of the prison. They contend that this court, by its reference to an "overriding threat to prison security, or to another similar state interest" (*ante,* p. 932), and by its reference to the "basically incompatible" language in *Grayned* (*ante,* p. 936) has established a different, and inappropriate, standard. To the extent that there is more than a semantic difference among these formulations, the difference is inconsequential for purposes of this case. We find no substantial evidence in this record to support a finding of interference.